[No. 30351. Department One. June 1, 1948.]

THE STATE OF WASHINGTON, *on the Relation of G. W. Showalter et al., Respondents,* v. T. S. GOODYEAR, *as State Supervisor of Forestry, et al., Appellants.*[1]

[1]Reported in 194 P. (2d) 389.

*The Attorney General* and *John Spiller, Assistant,* for appellants.

*W. C. Losey,* for respondents.

Schwellenbach, J.—This is an appeal from a judgment decreeing that certain lands described therein are not "forest lands" within contemplation, and under the provisions of chapter 105, p. 349, of the Laws of 1917 (Rem. Rev. Stat., § 5804 [P.P.C. § 575-73] *et seq.*), and chapter 97, p. 402, of the Laws of 1937 (Rem. Rev. Stat. (Sup.), § 5785 [P.P.C. § 575-19]), of the state of Washington; that the action of the supervisor of forestry and the director of the department of conservation and development, classifying said lands as forest lands and ordering the treasurer of Spokane county to extend on the tax rolls of Spokane county, as a lien against said lands, a tax of three and one-half cents per acre for patrolling and protecting said lands against fire, was arbitrary, capricious, and unlawful; that the action of the treasurer of Spokane county in attempting to collect such tax was arbitrary, capricious, and unlawful, and ordering him to cease and desist from attempting to collect such tax; that a writ of mandate issue directing the state officials above mentioned to strike from orders made, the lands of the relators, and to cancel and annul such orders, in so far as they related to lands of relators; that a writ of mandate issue directing the treasurer of Spokane county to cancel on the tax rolls in his office any and all unpaid fire taxes against the lands found in the judgment not to be "forest lands."

The above judgment was rendered following a hearing in a mandamus action commenced by G. W. Showalter and twenty-six or twenty-seven others, as relators, against the appellants, because of their alleged arbitrary, capricious, illegal, and fraudulent actions.

December 11, 1944, T. S. Goodyear, as supervisor of forestry, and Ed Davis, as director of conservation and devel-

opment, caused the following order to be delivered to the assessor of Spokane county:

"STATE OF WASHINGTON, DEPARTMENT OF CONSERVATION & DEVELOPMENT, DIVISION OF FORESTRY

"To the Assessor of Spokane County:

"I report herewith a list of Forest lands located in Spokane County which have been patrolled and protected for the season of 1944 under Provision of Chapter 105, Laws of 1917, and Chapter 184, Laws of 1923. The cost of patrolling and protecting said lands is three and one-half cents (3-½ cents) per acre, which you will please extend on the tax rolls of your county against the descriptions given in the attached list, containing one hundred and seventy-six (176) pages.                    (Signed)   T. S. Goodyear, State
                                        "Supervisor of Forestry.
"Ed Davis, Director of
"Conservation and Development."

An identical order was delivered October 21, 1946, with the single exception that the name of Art Garton appeared thereon as director of conservation and development.

The area involved comprises approximately ten thousand acres and is located in the vicinity of Tyler, in Spokane county.

The testimony is in conflict. Respondents testified that, although some of the land is under cultivation, most of it is scab land and is used for pasture. Around the potholes, there are some quaking asp, about twenty feet high; also some willows. There are some pine trees scattered over the area, some quite close together, and others up to five hundred or six hundred feet apart. They are knotty, scrub pine, of no commercial value. Practically all of the fires occurring in the area have been grass fires, started by the railroads, and not fires that went from one tree to another. One witness, shown a picture which in the distance appeared to be rather dense forest, testified that he could ride through there on a horse, after a stray cow, and not get his hat knocked off.

On the other hand, T. S. Goodyear, state supervisor of forestry, testified that the land involved was forest land. John E. Link, district fire warden for northeastern Wash-

ington, testified that they took aerial photographs of the lands involved, examined these photographs minutely with a magnifying glass, then went over the area to check their observations and satisfied themselves that it was forest land. This finding was substantiated by E. H. Steffen, special forester at Washington State College, Gordon D. Markworth, dean of the college of forestry at the University of Washington, and various representatives of the United States forest service, who all testified that, in their opinion, this was forest land. They also noticed, in the area involved, inflammable debris, consisting of tops of trees from logging operations, material which had been killed by fire, and dead trees which had blown over.

At the close of the testimony, the trial court, upon stipulation of all parties, viewed the area. He found that the land, with the exception of a small portion, did not constitute forest land.

In 1943, the people of this area, in conjunction with the people in adjoining rural areas in Spokane county, organized Spokane county fire district No. 3, under the provisions of Rem. Rev. Stat., § 5634-101 *et seq.* Taxes and assessments were regularly laid against the lands within the district. Fire district No. 3 has eleven fire fighting trucks, equipped with hose, located at strategic points in the district. In each place where a truck is situated, there are from three to nine men signed up to man the truck. The chief is located at Cheney. When a fire occurs in the district, the chief is notified by telephone, and he contacts other crews, who come to the aid of the fire fighters, in the event such action is necessary. The procedure is similar to that of a volunteer fire department in a small community, only on a larger scale. One truck is located in the area comprising the lands in question. However, the state forestry department has but one truck in the area also.

The trial court found that fire protection district No. 3 is fully equipped with all necessary modern fire-fighting apparatus for the protection of the lands involved, and that it has at its command adequate man power to operate the apparatus; that the owners of the lands involved in the liti-

gation have amply complied with the requirements of chapter 105 of the Laws of 1917, as amended, by furnishing all the necessary protection contemplated under the statute, for any and all "forest lands," belonging to respondents, and that T. S. Goodyear, as supervisor of forestry, and Art Garton, as director of conservation and development, in issuing the order above described for the year 1946, did arbitrarily, unlawfully, and capriciously, assess said lands.

Chapter 105, Laws of 1917, was:

"AN ACT relating to the forests of the state; requiring owners of forest land to provide patrol therefor, declaring certain dangerous forest conditions to be public nuisances and providing for their abatement, providing for the creation of official fire districts and for the co-operation of the state with other agencies in protecting such districts, prescribing methods for assessing and collecting the costs incurred in carrying out the provisions thereof, and prescribing the procedure for serving notices required thereby and by other forests laws of the state."

Section 1 provides:

"Every owner of forest land in the State of Washington shall furnish or provide therefor, during the season of the year when there is danger of forest fires, adequate protection against the spread of fire thereon or therefrom which shall meet with the approval of the state board of forest commissioners: *Provided, however,* That for the purposes of this section forest land shall be deemed to be adequately protected if within one mile of the owner's permanent residence or if the owner shall furnish patrol and protection therefor equal in standard, efficiency and seasonal duration to that of those who are in good faith maintaining organized patrol and protection of their lands against fire with the approval of the state board of forest commissioners: *Provided further,* That for the purposes of this section forest lands, lying in counties east of the summit of the Cascade mountains, shall be deemed to be adequately protected where patrol is furnished by the United States forest service of a standard and efficiency and seasonal duration, deemed by the state board of forest commissioners to be sufficient for the proper protection of the forest land of such counties."

Section 2, as amended by chapter 184, Laws of 1923, and by § 6, chapter 43, p. 31, Laws of 1925, Ex. Ses. (Rem. Rev. Stat., § 5805 [P.P.C. § 575-75]), provides:

"If any owner or owners of forest land neglect or fail to provide adequate fire protection therefor as required by section 5804, then the state supervisor of forestry under direction from the director of the Department of Conservation and Development shall provide such protection therefor at a cost not to exceed five (5) cents an acre per annum, and for that purpose may divide the forest lands of the state, or any part of the same, into districts, for patrol and assessment purposes, may classify lands according to the character of timber prevailing, and the fire hazard existing and place unprotected lands under the administration of the proper district. Any amounts paid or contracted to be paid by the said supervisor for this purpose from any funds at his disposal shall be a lien upon the property patroled and protected and, unless reimbursed by the owner within ten days after October 1st of the year in which they were incurred, on which date the said supervisor shall be prepared to make statement thereof upon request, to any forest owner whose own protection has not been previously approved by him as adequate, shall be reported by the said supervisor to the county assessor of the county or counties in which the property is situated who shall extend the amounts upon the tax rolls covering such property, and the amounts shall be collected at the time and in the same manner by the same procedure and with the same penalties attached that the next general state and county taxes on the same property are collected, except that errors in assessment may be corrected at any time by the said supervisor certifying the same to the county treasurer of the county in which the land involved is situated. Upon the collection of such assessments the county official shall repay said amounts to the said supervisor to be applied to the expenses incurred in carrying out the provisions of this section: *Provided,* That the said supervisor is hereby authorized and required to include in the assessment herein authorized against the owner or owners of forest lands neglecting to provide adequate fire protection, a sum not to exceed one-half of one cent per acre, to cover the necessary and reasonable cost of office and clerical work incurred in the enforcement of the provisions of section 5804 *et seq.* and subsequent amendments thereto, and is authorized to expend any sums heretofore collected from owners of forest

lands or coming from any other source for any necessary office and clerical expenses in connection with the enforcement of the provisions of section 5807: *Provided, further,* That whenever any lands against which such fire patrol assessments are outstanding are acquired for delinquent taxes and sold at public auction, the state shall have a prior lien on the proceeds of such sale over and above the amount necessary to satisfy the county's delinquent tax judgment, and the county treasurer in case the proceeds of such sale exceed the amount of the delinquent tax judgment aforesaid shall forthwith remit to the said supervisor the amount of such outstanding patrol assessments: *Provided, further,* That the said supervisor is required to furnish a good and sufficient bond of a surety company running to the State of Washington, in a sum as great as the probable amount of money annually coming into his hands under the provisions of this act, conditioned for the faithful performance of his duties as such officer and for a faithful accounting for all sums received and expended thereunder, which bond shall be approved by the attorney general."

Section 6 (Rem. Rev. Stat., § 5809 [P.P.C. § 575-89]) provides:

"For the purposes of this act any land shall be considered forest land which has enough timber, standing or down, or inflammable debris, to constitute in the judgment of the state board of forest commissioners a fire menace to life or property."

It will thus be seen that, for the purposes of the act, the decision as to what would constitute "forest land" devolved upon the judgment of the state board of forest commissioners.

Chapter 164, p. 320, Laws of 1905 (Rem. & Bal. Code, § 5276), created the state board of forest commissioners, to consist of the state land commissioner, and four electors of the state of Washington, to be appointed by the governor.

Section 135, chapter 7, p. 12, Laws of 1921 (Rem. Rev. Stat., § 10893 [P.P.C. § 226-35]) (the administrative code), abolished, among other things, the state board of forest commissioners.

Section 67 of that act (Rem. Rev. Stat., § 10825 [P.P.C. § 230-13]) (the administrative code) provided, among other things:

"The director of conservation and development shall have the power, and it shall be his duty, through and by means of the division of forestry:

"(1) To exercise all the powers and perform all the duties now vested in, and required to be performed by, the state board of forest commissioners;

"(2) To exercise all the powers and perform all the duties now vested in, and required to be performed by, the state forester";

■ The duty of determining what are "forest lands," therefore, is now in the director of conservation and development. This is a broad, discretionary power, given to him by the legislature. When he, through his department, makes that determination, courts cannot grant relief by mandamus, unless, under pretense of exercising discretion, he exercises that power with manifest injustice, or the power is grossly abused. In *State ex rel. Brown v. Board of Dental Examiners*, 38 Wash. 325, 80 Pac. 544, we said:

"The action of the court must, in reality, be based upon the assumption that the inferior tribunal has refused to exercise the discretion with which it is clothed; because, if it acts arbitrarily or fraudulently, or through unworthy or selfish motives, or conspires against the rights of individuals, under the law, and therefore against the law itself, it has not strictly, as is frequently said, 'abused its discretion'—a term which is responsible for some confusion of ideas on this subject—but in contemplation of law, it has not exercised its discretion at all, but has sought to substitute arbitrary and fraudulent disposition and determination of the question submitted, for the honest discretion demanded by the law. In such cases the law will, by mandamus, compel the tribunal to act honestly and fairly, or, in other words, to *exercise its discretion*; and, when this distinction is kept in mind, the seeming difficulties which have surrounded this question, and which have caused so much discussion, disappear."

In *St. Joseph Stock Yards v. United States*, 298 U. S. 38, 80 L. Ed. 1033, 56 S. Ct. 720, the United States supreme court, speaking through Mr. Chief Justice Hughes, said:

"In view, however, of the discussion in the court's opinion, the preliminary question should be considered. The fixing of rates is a legislative act. In determining the scope of

judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. The court does not sit as a board of revision to substitute its judgment for that of the legislature or its agents as to matters within the province of either. *San Diego Land & Town Co. v. Jasper,* 189 U. S. 439, 446; *Minnesota Rate Cases,* 230 U. S. 352, 433; *Los Angeles Gas Corp. v. Railroad Commission,* 289 U. S. 287, 304. When the legislature itself acts within the broad field of legislative discretion, its determinations are conclusive. When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. *Interstate Commerce Comm'n v. Louisville & Nashville R. Co.,* 227 U. S. 88, 91; *Virginian Ry. Co. v. United States,* 272 U. S. 658, 663; *Tagg Bros. & Moorhead v. United States, supra,* p. 444; *Florida v. United States,* 292 U. S. 1, 12. In such cases, the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority.

"But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When the legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these limits of power. The legislature cannot preclude that scrutiny and determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and

impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded. It is said that we can retain judicial authority to examine the weight of evidence when the question concerns the right of personal liberty. But if this be so, it is not because we are privileged to perform our judicial duty in that case and for reasons of convenience to disregard it in others. The principle applies when rights either of person or of property are protected by constitutional restrictions. Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority. This is the purport of the decisions above cited with respect to the exercise of an independent judicial judgment upon the facts where confiscation is alleged. The question under the Packers and Stockyards Act is not different from that arising under any other act, and we see no reason why those decisions should be overruled.

"But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency. Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests. We have said that 'in a question of ratemaking there is a strong presumption in favor of the conclusions reached by an experienced administrative body

after a full hearing.' *Darnell v. Edwards,* 244 U. S. 564, 569. The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. *Los Angeles Gas Corp. v. Railroad Commission,* 289 U. S. 287, 305; *Lindheimer v. Illinois Telephone Co.,* 292 U. S. 151, 169; *Dayton Power & Light Co. v. Public Utilities Comm'n,* 292 U. S. 290, 298."

In *State ex rel. Lukens v. Spokane School Dist. No. 81,* 147 Wash. 467, 266 Pac. 189, in ruling on the power of a school board to change the location of a school building, we said:

"In a nut shell, this whole controversy arises over a question of judgment. The petitioners before the board, the appellants here, are not in agreement with the members of the board. That disagreement of itself is not for the courts. The law has plainly vested the board of directors of school districts such as this with discretionary powers in such matters, and the directors having examined into and passed upon the matter in the exercise of their discretion, the courts have no right or power to review the conclusions reached by them as a board in the absence of a showing of abuse of discretion on their part, which is not the case here."

We may disagree with the finding of the department that the lands involved are "forest lands," but we have no right to substitute our judgment for that of the department. We can only grant relief when we are convinced that the department acted arbitrarily and capriciously in making that finding. When we consider the testimony as to the method used by the department in making that determination, coupled with the fact that such determination, in the opinion of the heads of the forestry departments of Washington State College and the University of Washington, was proper, we cannot say that such determination was arbitrary or capricious.

Courts are granted more latitude in reviewing, in an action in mandamus, decisions made by an administrative board or officer, merely as an incident to the performance

of functions required to be performed in a ministerial capacity, as distinguished from decisions made when the board or officer is acting in a quasi-judicial capacity, or as a tribunal.

In *Beaverdale Memorial Park v. Danaher*, 127 Conn. 175, 15 A. (2d) 17, the court said:

"The term 'administrative board' is very broad and includes bodies exercising varied functions, some of which involve orders made or other acts done ex parte or without full hearing as to the operative facts, while others are done only after such notice and hearing. The functions of the former kind are plainly administrative and those of the latter are quasi judicial. The function of the court in reviewing the proceedings of an administrative board depends upon the character of the proceeding. In cases where the statute provides for a full hearing and record before the administrative board, the procedure on the so-called appeal, like the procedure upon a trial before a judge, is upon the record of the proceedings before the board; and from this record it can be determined whether the board acted arbitrarily, unreasonably, or contrary to law. On the other hand, where it does not appear from the record of the proceedings before the administrative board whether or not its decision was legally warranted by the facts upon which it acted, evidence may be received by the court acting on the appeal as to the testimony before the administrative board and the proceedings upon which it acted, *Grady v. Katz*, 124 Conn. 525, 530, 1 Atl. (2d) 137, or, on the other hand, the court upon appeal may hear evidence itself or by a reference and determine for itself what the facts were and assume that the administrative board acted upon those facts. *Levine v. Zoning Board of Appeals of Meriden*, 124 Conn. 53, 57, 189 Atl. 173; *Skarzynski v. Liquor Control Commission*, 122 Conn. 522, 526, 191 Atl. 98."

However, in the instant case, considering the broad discretionary powers granted to the director, we cannot say, from an examination of all of the facts, that he was not warranted in finding that these were "forest lands."

Section 2 of chapter 168, p. 458, of the Laws of 1941 (Rem. Rev. Stat. (Sup.), § 5804 [P.P.C. § 575-73]), provides:

"SEC. 2. That section 1 of chapter 105 of the Laws of 1917 (section 5804 of Remington's Revised Statutes) be amended to read as follows:

"Section 1. Every owner of forest land in the State of Washington shall furnish or provide therefor, during the season of the year when there is danger of forest fires, adequate protection against the spread of fire thereon or therefrom which shall meet with the approval of the State Forest Board: *Provided*, That for the purposes of this section forest lands, lying in counties east of the summit of the Cascade mountains, shall be deemed to be adequately protected where patrol is furnished by the United States forest service of a standard and efficiency and seasonal duration, deemed by the State Forest Board to be sufficient for the proper protection of the forest land of such counties."

Chapter 154, p. 494, of the Laws of 1923 (Rem. Rev. Stat., § 5812-1 [P.P.C. § 576-1]), created the state forest board, to consist of ex officio, the governor, commissioner of public lands, dean of forestry of the University of Washington, director of conservation and development, and state supervisor of forestry.

As a result of the various amendments, we have a hodge-podge of responsibility. *The director of conservation and development* determines whether the lands in question are "forest lands." Every owner of "forest land" shall furnish or provide for adequate protection against the spread of fire, which protection must meet with the approval of the *state forest board.* If any owner or owners of "forest land" shall neglect or fail to provide adequate protection as required by the act, then the *state forester,* under direction from the director of conservation and development, shall provide such protection at a cost not to exceed five cents per acre.

It will thus be seen that, unless the owners furnish adequate protection against the spread of fire, *which shall meet with the approval of the state forest board,* it becomes the duty of the state forester to provide such protection. The approval of the state forest board of the fire protection provided by the owners, in this case, was never requested or obtained. In justice to all parties, this provision of the act was ignored by not only the owners, but by the department of conservation and development as well, everybody seeming to be of the opinion that this responsibility rested

with the department. Nevertheless, the legislature placed the responsibility of approving the fire protection upon the state forest board. Their approval not having been obtained, it follows that the acts of the state forester, under direction from the director of conservation and development, in furnishing adequate fire protection to the lands involved, and in directing the assessor of Spokane county to extend on the tax rolls the cost of such protection, in the amount of three and one-half cents per acre, were not, under the circumstances, arbitrary and capricious.

The judgment will be reversed.

MALLERY, C. J., MILLARD, and HILL, JJ., concur.

SIMPSON, J., dissents.

[1]Reported in 194 P. (2d) 357.