[No. 64821-2. En Banc.]
Argued June 24, 1997. Decided December 24, 1997.
US WEST COMMUNICATIONS, INC., *Appellant*, v. UTILITIES
AND TRANSPORTATION COMMISSION, *Respondent*.

50

*Perkins Coie*, by *Sherilyn Peterson*; and *Edward T. Shaw*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Shannon E. Smith, Sally G. Johnston, Gregory J. Trautman*, and *Robert F. Manifold, Assistants*, for respondent.

*Richard A. Finnigan*; GTE Northwest-Legal Department, by *Richard E. Potter* and *Timothy J. O'Connell*; and *Miller, Nash, Wiener, Hager & Carlsen*, by *Clyde H. MacIver*, for appellant intervenors.

*Ater, Wynne, Hewitt, Dodson & Skerritt*, by *Arthur A. Butler* and *Stephen J. Kennedy*, for respondent intervenors.

GUY, J. — This is an appeal from a decision of the Washington Utilities and Transportation Commission granting in part and denying in part a petition for an accounting order filed by a telecommunications company. We affirm the Commission's decision.

## FACTS

On May 12, 1994, US West Communications, Inc. (US West or Company) petitioned to the Washington Utilities and Transportation Commission (Commission) for an accounting order authorizing it to change, for intrastate ratemaking purposes, certain depreciation methodology, accounting and depreciation lives. The Company requested authorization: (1) to adopt the Equal Life Group (ELG) depreciation methodology in place of Vintage Group (VG) depreciation, effective with 1982/83 vintages; (2) to amor-

tize, over a period of five years, a deficiency in its depreciation reserve account; and (3) to adopt shorter lives for 10 categories of plant.

At the request of US West and by agreement of the parties, the case was submitted for the Commission's decision on written prefiled testimony, rebuttal, and briefs. On May 26, 1995, the Commission served its order on the merits of the case, which was denominated its Fourth Supplemental Order. The Commission: (1) authorized US West to adopt ELG on a going-forward basis starting with plant of 1995 vintage; (2) authorized US West to amortize its depreciation reserve deficiency as found in the order over five years; and (3) rejected the Company's proposal to shorten depreciation lives. While the Commission granted US West's request to adopt ELG methodology on a going-forward basis beginning with vintage year 1995, it did not grant US West's request to adopt ELG for vintages in service since 1982/83.

US West appealed to the Superior Court, which found that the Commission's factual findings were not sufficient to enable the court to determine the basis for the Commission's decision. The Superior Court returned the case to the Commission for entry of more specific findings. On remand, the Commission made additional findings in support of its conclusions and again denied US West's requests to adopt ELG for earlier vintages and to shorten lives. US West again appealed.

On the second appeal, the Superior Court affirmed the Commission's order. Judge Lasnik found that the Commission's findings of fact regarding retroactive application of ELG were amply supported by the record and that the Commission gave sufficient reasons, also amply supported by the record, to support its decision that the depreciation lives should not be shortened. We accepted direct review and assigned this case as a companion case to the US West

rate case, *US West Communications, Inc. v. Utilities & Transp. Comm'n*, 134 Wn.2d 74 (1997).[1] Further facts are included below as relevant to the issues.

## ISSUES

Did the Commission exceed its statutory authority or act in an arbitrary or capricious manner in refusing to allow US West to apply the ELG depreciation method to property put in use prior to 1995? Were the Commission's reasons given to support only going-forward application of the ELG method of depreciation supported by substantial evidence in the record before the Commission?

Did the Commission exceed its statutory authority or act in an arbitrary or capricious manner in refusing to grant US West's petition to shorten the depreciation lives of certain types of property? Were the Commission's reasons given to support its decision not to allow US West to shorten depreciation lives supported by substantial evidence in the record before the Commission?

Are the Commission's decisions authorizing US West to adopt ELG on a going-forward basis and rejecting US West's proposal to shorten depreciation lives unconstitutional?[2]

## BACKGROUND

■ The function of rate making is legislative in character, and the Commission is the regulatory agency charged by statute with setting public utility rates in this state; the judicial branch is not empowered to itself undertake to fix

---

[1]During the pendency of this depreciation case, US West and the Commission were conducting a general rate case where US West was seeking a rate increase. US West filed this depreciation case on May 12, 1994, and, while it was pending before the Commission, filed a rate case on February 17, 1995.

[2]US West also raises the issue in this case whether the Commission's segregation of depreciation evidence between the depreciation and rate cases was unlawful. This issue is also raised in the rate case, *US West Communications, Inc. v. Utilities & Transp. Comm'n*, 134 Wn.2d 74 (1997), docketed as the companion case to this case. Since the issue is whether the Commission should have allowed the depreciation evidence submitted in this case to be admitted again in the rate case, the issue is more properly decided in the rate case.

rates. *People's Org. for Wash. Energy Resources (POWER) v. Utilities & Transp. Comm'n,* 104 Wn.2d 798, 807-08, 711 P.2d 319 (1985). The Commission is directed to "[r]egulate in the public interest . . . the rates, services, facilities, and practices of all persons . . . supplying any utility service . . . including . . . telecommunications companies." RCW 80.01.040(3). The Commission is to set rates which are fair, just, reasonable and sufficient. RCW 80.36.080. The Commission has the power to "ascertain and by order fix the proper and adequate rates of depreciation or retirement of the several classes of property of each public service company." RCW 80.04.350.

■ US West, as a regulated utility, receives a return on its investment in providing utility service. The revenue allowed to the utility is determined by adding the operating expenses to the rate base multiplied by the allowed rate of return. Included in the operating expenses is depreciation of the utility's property. *POWER,* 104 Wn.2d at 808-09. *Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n,* 476 U.S. 355, 364-65, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986) contains a concise description of depreciation as it applies to the telephone industry:

> Depreciation is defined as the loss in service value of a capital asset over time. In the context of public utility accounting and regulation, it is a process of charging the cost of depreciable property, adjusted for net salvage, to operating expense accounts over the useful life of the asset. Thus, accounting practices significantly affect, among other things, the rates that customers pay for service. This is so because a regulated carrier is entitled to recover its reasonable expenses and a fair return on its investment through the rates it charges its customers, and because depreciation practices contribute importantly to the calculation of both the carrier's investment and its expenses.

There are many different depreciation accounting methods. In the telecommunications industry, property is grouped for purposes of depreciation since it would not be practical to assign a depreciation life to each unit of prop-

erty. VG and ELG are two accounting methods which use different ways of grouping assets for depreciation purposes. Under VG, all assets acquired in a given year (a vintage) are grouped into a category and then the lives are averaged. The ELG method subdivides the vintage group into subgroups of assets with the same anticipated service life.

Historically, the Commission has required large utilities and telephone companies to use VG, together with "remaining life," for purposes of depreciation. Under "remaining life depreciation," the remaining undepreciated plant in each account is depreciated over the current estimate of the remaining life of that account. For many years, US West and its predecessor, Pacific Northwest Bell, have been disagreeing with the Commission over which accounting method is appropriate.

BURDEN OF PROOF AND STANDARD OF REVIEW

■ In its petition, US West sought an accounting order pertaining to depreciation. The rate of depreciation directly affects rates. *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 364-65; *see POWER,* 104 Wn.2d at 809, 817. Therefore, the burden to demonstrate the need for shortening depreciation lives and for applying the ELG method to older vintages of property was on US West. RCW 80.04.130(2).

■ Judicial review of the Commission's order is conducted under the Administrative Procedure Act, RCW 34.05. *Tanner Elec. Coop. v. Puget Sound Power & Light,* 128 Wn.2d 656, 667, 911 P.2d 1301 (1996); *POWER,* 104 Wn.2d at 812. The burden of demonstrating the invalidity of agency action is on the party asserting invalidity. RCW 34.05.570(1)(a). RCW 34.05.570(3) provides in relevant part that the court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:

(a) The order . . . is in violation of constitutional provisions on its face or as applied;

(b) The order is outside the statutory authority or jurisdiction of the agency . . .

(c) The agency has engaged in unlawful procedure or decision-making process . . .

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . .

(f) The agency has not decided all issues requiring resolution by the agency;

. . . .

(h) . . . or

(i) The order is arbitrary or capricious.

The Commission decides questions of fact, and review by this Court is of the Commission's findings and not a review of the superior court's decision. *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 633, 869 P.2d 1034 (1994); *Inland Empire Distrib. Sys., Inc. v. Utilities & Transp. Comm'n*, 112 Wn.2d 278, 282, 770 P.2d 624, 87 A.L.R.4TH 627 (1989). The Commission's findings of fact are reviewed under a substantial evidence standard. *In re Electric Lightwave, Inc.*, 123 Wn.2d 530, 542, 869 P.2d 1045 (1994).

The Commission has broad generalized powers in rate-setting matters. *Jewell v. Utilities & Transp. Comm'n*, 90 Wn.2d 775, 776, 585 P.2d 1167 (1978). We generally accord substantial deference to agency decisions, although we do not defer to an agency the power to determine the scope of its own authority. *Electric Lightwave*, 123 Wn.2d at 540. In *POWER*, 104 Wn.2d at 812, we explained that courts are not at liberty to substitute their judgment for that of the Commission in rate cases and that within a fairly broad range, regulatory agencies exercise substantial discretion in selecting the appropriate rate-making methodology. *See also Cole v. Utilities & Transp. Comm'n*, 79 Wn.2d 302, 309, 485 P.2d 71 (1971) (burden of proof is on the appellant to show the findings and conclusions of the Commission are unlawful, unsupported by the evidence, arbitrary or

capricious—and this is especially true when the issues involve complex factual determinations peculiarly within the expertise of the Commission).

## ADOPTION OF THE ELG METHOD OF DEPRECIATION ON A GOING-FORWARD BASIS

In the early 1980s, Pacific Northwest Bell petitioned for authority to use ELG, and the Commission denied those requests. Later, the Federal Communications Commission (FCC) issued an order preempting states from prescribing depreciation regulations for intrastate purposes that were inconsistent with those prescribed by the FCC for interstate purposes. The Commission therefore authorized the Company to use ELG in Washington subject to refund in the event the Commission's appeal of the FCC's order was successful. The Commissions of 23 states argued to the Supreme Court that the FCC lacked authority to establish depreciation practices as they relate to setting of rates for intrastate telephone service. *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 358.

In 1986, the Supreme Court overruled the FCC order and held that the FCC could not preempt the state commissions' authority to prescribe depreciation procedures in setting intrastate rates for telecommunications service. *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 374-75. The Court discussed ELG and VG but refused to accept the argument that state regulators had to allow the ELG method in place of other depreciation methods. The Washington Commission reopened the prior hearing on depreciation and ultimately entered into a settlement agreement. As part of the settlement, the Company agreed "to give up the Equal Life Group (ELG) depreciation methodology for purposes of calculating intrastate depreciation expense in this case and during the 1987 represcrip-

tion without prejudice to argue for that methodology at some future time." Clerk's Papers at 92.[3]

US West again petitioned to use ELG in 1992. The Commission denied the petition as not in the public interest since it would alter the framework under which US West's alternative form of regulation[4] was adopted.

In May 1994, US West filed the petition which is the subject of this appeal, again seeking authorization to use the ELG depreciation method. As noted above, the Commission did allow the change to ELG but refused to allow the Company to apply the new method to plant put in use prior to 1995. US West contends the Commission erred in not allowing the ELG method to be applied to embedded plant, specifically to property put in use between 1982/83 and 1995.

The three relevant inquiries are whether the Commission acted lawfully within its statutory authority, whether its actions were arbitrary or capricious, and whether the reasons for its decision were supported by evidence that is substantial when viewed in light of the whole record. RCW 34.05.570.

■■ The primary statute which governs the Commission's authority in this case is RCW 80.04.350, which provides:

The commission shall have power after hearing to require any or all public service companies to carry proper and adequate depreciation or retirement accounts in accordance with such rules, regulations and forms of accounts as the commission may prescribe. The commission may from time to time

---

[3]Cross-assignments of error have been made to this Court, arguing that the Superior Court erred when it ruled that US West was not legally precluded from arguing for the retroactive application of ELG based solely on this 1987 settlement agreement. The Commission did not base its denial of retroactive application of ELG on the 1987 settlement agreement, and it is unnecessary to decide this issue since we have concluded the Commission acted lawfully in its order giving prospective application to its decision to allow the Company to use the ELG methodology.

[4]From 1990 through 1994, US West was regulated by the Commission under an alternative form of regulation.

ascertain and by order fix the proper and adequate rates of depreciation or retirement of the several classes of property of each public service company. Each public service company shall conform its depreciation or retirement accounts to the rates so prescribed. In fixing the rate of the annual depreciation or retirement charge, the commission may consider the rate and amount theretofore charged by the company for depreciation or retirement.

The Commission shall have and exercise like power and authority over all other reserve accounts of public service companies.

This statute allows broad discretion to the Commission to set depreciation rates and methods. It also expressly allows the Commission to consider the depreciation rates that were previously in effect. Historically, the Commission has required US West to use the VG depreciation method. The Commission clearly acted within its statutory authority in setting the time for implementation of the newer accounting method.

In determining whether the Commission's decision was arbitrary or capricious, it is necessary to look to the rationale of the Commission. The Commission relied on a number of reasons to support its decision to give prospective application to the change to the ELG method of depreciation: (1) for any given vintage, the total amount of depreciation taken over the life of the asset is the same under VG as under ELG; (2) remaining life depreciation combined with either VG or ELG ensures that the utility always has an opportunity to recover its investments; (3) US West has consistently achieved full and timely capital recovery in Washington; (4) retroactive application of ELG would exacerbate the problem of intergenerational inequity; (5) a number of states do not allow ELG at all, much less on a retroactive basis; (6) the FCC implemented ELG on a going-forward basis.

As Judge Lasnik of the Superior Court concluded, there is substantial support in the administrative record to support these conclusions. The experts testifying for US West

disagreed with the conclusions of the experts testifying for the Commission staff, and for Public Counsel[5] and TRACER,[6] but there is substantial evidence to support each of the Commission's conclusions.

The testimony of Public Counsel and TRACER witness, Charles King, and Commission staff witness, Thomas Spinks, supports the finding that the total amount of depreciation over the life of an asset is the same with VG as with ELG: For any given vintage, the total amount of depreciation recovered is the same under VG as under ELG; it is the total original cost of the vintage. Administrative Record (AR) at 652 (testimony of Charles King). Granting ELG on a retroactive basis would not provide any better matching than granting ELG on a prospective basis but would create additional depreciation expense and a higher depreciation reserve deficiency. AR at 607 (testimony of Thomas L. Spinks).

The conclusions that "remaining life depreciation" combined with either VG or ELG ensures that the utility always has an opportunity to recover its investments, and that US West has consistently achieved full and timely capital recovery in Washington are supported in the record: "Remaining life depreciation" adjusts the rate each time there is a change in the perception of service life; the use of the remaining life method combined with either VG or ELG ensures that the Company recovers its investment. AR at 653 (testimony of Charles King). ELG does not necessarily provide a closer matching of consumption and accruals in practice, and US West has always achieved full capital recovery in this state. AR at 605 (testimony of Thomas L. Spinks).

In its order, the Commission found that changing from

---

[5]Public Counsel refers to the Public Counsel Section of the State Attorney General's office. Public Counsel represents the people of the State in utility regulatory matters as a statutory party. RCW 80.01.100, 80.04.510.

[6]TRACER is the Washington Telecommunications Ratepayers Association for Cost-based and Equitable Rates. It is an association of Washington businesses and entities that are significant users of telecommunications services, including those provided by US West.

VG to ELG, even on a going-forward basis only, would create an inequity among generations of ratepayers. It would require current and future ratepayers to pay higher depreciation charges and reserve deficiency amortizations for reasons that are unrelated to their relative use of the assets or the cause of the assets' retirement. The current and future ratepayers would have to pay the higher ELG depreciation rates on new plant, and also would inherit the much higher rate base and return allowances that result from past use of VG depreciation on old vintages. Changing from VG to ELG on a retroactive basis would create additional depreciation expense and a higher depreciation reserve deficiency, and thus higher rates, substantially increasing the generational inequity. The Commission found that phasing in the new methodology by applying it on a going-forward basis only would substantially reduce the immediate impact on revenue requirements and minimize the intergenerational inequity that will result from the change. It concluded it was a reasonable and prudent approach for this time of transition in the industry and was the approach that is most likely to result in rates that are fair, just, reasonable, and sufficient.

The Commission's conclusion that retroactive application of ELG would exacerbate the problem of intergenerational inequity is supported by the record: If US West's proposal to give retroactive application of ELG were accepted, the post-1982/83 vintages will be depreciated under one procedure during the early years of their lives, and then under another, more accelerated procedure, in their later years, resulting in a depreciation recovery program that is neither straight line nor based on any acceptable measure of life or value consumption. Depreciation would suddenly increase based solely on a change in calculation procedure, resulting in intergenerational inequity. US West's proposal would require current and future ratepayers to pay significantly higher depreciation charges and reserve deficiency amortizations for no valid economic reason. AR at 654-55 (testimony of Charles King).

 US West argues that the Commission's finding that

retroactive application of ELG would exacerbate the problem of intergenerational inequity "is unsupported by logic." The experts differed on this complex issue. It is not a reviewing court's task to weigh credibility, and we will not substitute our judgment for that of the Commission in rate cases on such matters. Within a fairly broad range, the Commission exercises substantial discretion in selecting the appropriate ratemaking methodology. *POWER*, 104 Wn.2d at 812.

US West argues that whatever good reasons the Commission had to allow it to change to the ELG method also applied to why the method should also be applied to older vintages. However, the Public Counsel witness testified that it was the *change* in method, particularly mid-life in an asset, which caused the inequity.

US West also argues that whatever was true in the past, the onset of competition in the telecommunications industry and the rapid growth in technology may not allow it to recover its investment in the future. US West argues that the Commission failed to consider the future of the industry, which will include increasing competition. The record does not support this argument. The Commission order demonstrates that the Commission did consider the changing character of the industry when it decided to give prospective application to the implementation of the ELG depreciation methodology. The Commission stated:

> Granting retroactive application of ELG would not reasonably balance Company and ratepayer interests given the substantial intergenerational inequity that such treatment would be certain to create and *the uncertainty over when, if, and the extent to which competition will accelerate plant obsolescence to the point that U S West will be unable to fully recover its investment.* Retroactive application of ELG would create an unacceptable potential of a windfall for U S West at the expense of current and future ratepayers.

AR at 892 (emphasis added).

The Commission concluded, "[w]e believe that phasing-in ELG on a going-forward basis in Washington is the only

reasonable and fair approach given the effect of the change on revenue requirements and *the uncertainties regarding the effects of competition.*" AR at 883; *see also* AR at 891.

The record also supports the Commission's finding that a number of states do not allow ELG at all and its finding that the FCC implemented ELG on a going-forward basis.

We conclude the Commission's decision is within its statutory authority, is supported by rational reasons, and its findings are supported by substantial evidence in the administrative record.

## LENGTH OF DEPRECIATION LIVES

■■■ ■■■ The statutory authority of the Commission includes the duty to set the rate of depreciation for utilities. RCW 80.04.350. The Commission clearly acted within its statutory duty in setting service lives which determine the rate of depreciation the Company is allowed. Whether the lives set are "proper and adequate," as required in RCW 80.04.350, is challenged by US West.

US West argued to the Commission that current depreciation lives allowed in this state fail to adequately recognize the current technological and market realities of the increasingly competitive telecommunications industry. The Commission staff, Public Counsel, and TRACER all recommended that the Commission reject the Company's proposal for shorter lives.

The Commission's order concluded that US West had not carried its burden under RCW 80.04.130(2) to demonstrate the need for shortening depreciation lives. The Commission recognized that economically useful lives are becoming shorter. However, it went on to explain that the current lives, set in the 1993 three-way meeting among US West, the Commission and the FCC, effective January 1994, reflect this trend since they are shorter than historic lives as determined in the depreciation studies. The Commission noted that the 1993 negotiations had considered all factors leading to shortened service lives, including historic life indications, recent retirement activity, recent technological changes, and the stated plans of US West.

The Commission concluded that US West had not demonstrated any major changes in competitive or technological circumstances since the latest setting of lives. The Commission rejected the Company's assertion that the 1994 *Electric Lightwave* decision had changed the competitive environment because that decision affirmed a 1992 superior court decision which the Commission had promptly implemented. The Commission concluded that the entry of new companies into the market was clearly foreseeable in 1993 when the current service lives were negotiated and set.[7] Further, the Commission agreed with staff witness Spinks' testimony that there is no evidence that the advent of competition in the last two years has influenced the pace of planned retirements in a manner that would reduce service lives.

The Commission also found that the Technology Futures, Inc. (TFI) studies on which US West relies for revising service lives of certain categories of plant are not an adequate basis for revising those lives. The Commission concluded that the studies are generic to the entire industry; the model used (Fisher-Pry) was developed to estimate the plant life spans based upon forecasts of the rate of change in the adoption of substitute technologies; and that the studies are based largely on conjecture, subjective assumptions, and assertions as to rates of plant obsolescence, technological innovation, and new service requirements that are incapable of test or verification. The Commission concluded the model uses only a single variable to explain rates of change, is not a sophisticated econometric model, and that no probability statistics are provided with the forecasts.

---

[7]Public Counsel and TRACER have moved to strike argument about the Telecommunications Act of 1996 because evidence regarding the passage of the Act and its implications for the development of competition was not presented below. We deny that motion to strike. However, we do not find that the passage of that Act has a substantial effect on our decision. While the primary relevance of the Act to this case is its effect on competition, we note that this state was opened to competition even before the passage of the federal Act. *See Electric Lightwave*, 123 Wn.2d 530. As noted above, the Commission did consider the advent of competition in making its decisions on the depreciation issues.

The Commission found that the proposed service lives were not supported by any empirical evidence of reduced service life and that the Company's 1994 depreciation rate study shows that the pattern of recent retirements in Washington suggests longer, not shorter, lives.

US West now argues that the Commission erroneously established three-year-old lives as presumptively accurate for this competitive environment, that the Commission erred in finding the service lives had been recently set, and that the Commission abdicated its duty to set lives by deferring decision making to the 1996 triennial represcription process.[8]

The Commission responds that US West's corporate strategy is to try to over-collect on depreciation now, while it has a captive customer base. The Commission states that if its markets later become competitive, US West would then have an unfair competitive advantage over other companies and earn millions in excess profits because its network would already have been paid for by monopoly ratepayers. The Commission contends it fully considered the effects of competition in its order and fairly balanced the interests of both shareholders and ratepayers. TRACER and Public Counsel also urge this Court to affirm the Commission's order.

US West's assertion to this Court that the Commission refused to adjust three-year-old lives is not supported by the record. The service lives were negotiated among US West, the Commission and the FCC in late 1993 and effective in 1994. US West filed this case asking for a change of lives in May 1994, and the expert testimony was filed in the Fall of 1994. Therefore, when the evidence was submitted in this case, the service lives had been recently renegotiated. Most importantly, the Commission is authorized by statute to consider the presently set lives in any petition to change lives. RCW 80.04.350 states that in fixing the rate

---

[8]The "triennial represcription process" refers to the meetings among US West, the Commission, and the Federal Communications Commission which occur every three years in order to negotiate depreciation lives and parameters.

of depreciation (which is established by the lives of assets), the Commission may consider the rate theretofore charged by the company. Therefore, the Commission's consideration of past lives which were established in the three-way meeting, the 1993 represcription process, was proper.

We conclude the Commission did not "defer" its decision making to the 1996 negotiation process. Rather, it concluded that at the time of this petition, US West had not carried its burden to show that shorter service lives were appropriate. The Commission had over 1,000 pages of expert testimony on the issue of depreciation method, amortization and lives, and it made detailed findings concerning each issue US West presented. It then concluded that, at the time of the petition, US West had not carried its burden to show shorter lives were warranted. It recognized that the 1996 negotiations were the next forum US West would have to discuss changed circumstances that might warrant different service lives.

US West offered a comparison of depreciation rates in an attempt to show the rates in Washington were too low. However, Commission witness Spinks testified that the comparison of composite depreciation rates between Washington's intrastate jurisdiction and the regional Bell operating companies was inappropriate because it was misleading.

The Commission's reasons for refusing to allow US West to shorten lives included that the Company had failed to carry its burden to show that lives should be shortened; the Company's 1994 depreciation rate study indicates lives should be lengthened, not shortened; and the industry-sponsored TFI studies are not reliable.

These reasons to deny shortening lives are supported by the record. Public Counsel and TRACER witness, Charles King, testified that the Commission did not have an adequate basis for changing the service lives that underlie US West's depreciation rates. He testified that the Company's 1994 depreciation study shows that the pattern of recent retirements in this state suggests longer, not shorter, ser-

vice lives. He concluded that the studies used by the Company did not rely on empirical evidence but on conjecture, assumptions and theoretical models and did not provide a valid basis for imposing a large increase in the rates paid by Washington's telephone subscribers. Mr. King also testified that the proposal to shorten lives should be denied because it is unsupported by objective empirical evidence and because it would shift onto present telephone ratepayers the burden of premature retirements that are caused by the Company's plans to invade new communications markets, most notably video.

Thomas Spinks testified that he would not find the life forecasts resulting from the Fisher-Pry model used in the TFI studies to be economic lives. Mr. Spinks also testified that US West's 1994 depreciation rate study supports considerably longer service lives than those proposed by US West in its petition. With regard to the effect of future competition, Mr. Spinks testified that the basic way in which competition will affect existing plant service lives is to create economic obsolescence, but that there are remaining barriers to competition. He testified that rapid technological changes are creating uncertainty as to whether current asset lives will be longer or shorter in the future. Mr. Spinks also testified that the recent removal of legal barriers to competition in Washington has not created economic obsolescence in existing plant or equipment.

The record indicates that the Company used its 1994 depreciation rate study to propose life projections for various major classes of its equipment. The 1994 study was based partially on industry studies prepared by TFI. Those studies were commissioned by an industry association comprised of the Bell operating companies, the major independent telephone companies, and Bell Canada. US West was one of the companies which commissioned the TFI study. The Commission's criticisms of the TFI studies are supported by the testimony of Mr. King and Mr. Spinks.

US West argues that the Commission did not consider the effects of competition in deciding the depreciation is-

sues. US West relies heavily on the Commission's statement that the ability of the Company to fully recover its investment after competition becomes effective is uncertain. However, the Commission also found that because of this fact it was allowing the Company to change to ELG because that method comparatively front-loads depreciation into the early years of the vintage's life, and its use would allow the Company to recover more of its investment should full recovery become difficult to achieve. The Commission also found that the speed at which competition will develop, how effective it will turn out to be, and the effect of competition on technological obsolescence are unknown. Testimony shows that what effect new competition in the telecommunications field will have on the existing plant service lives of depreciable property is a very fact-intensive inquiry.

The subject of depreciation accounting is highly specialized and complex. The record shows that federal and state regulatory bodies have separate depreciation branches devoted to the determination of proper depreciation rates, and specialized schools exist to teach how to analyze data to determine depreciation parameters. This case was essentially a battle of the experts on the effect competition will have on the telecommunications industry, how quickly new technology will need to be implemented, and those events' effect on the lives of currently used equipment. Mr. Vanston of TFI (testifying for US West) notes that the real question is whether the assumptions that he and TFI have made about the future or the assumptions that Mr. Spinks (Commission staff) and Mr. King (testifying for Public Counsel and TRACER) have made about the future are more valid. The Supreme Court has explained that "[t]he calculations [of depreciation expenses] are mathematical but the predictions underlying them are essentially matters of opinion." *Lindheimer v. Illinois Bell Tel. Co.*, 292 U.S. 151, 169, 54 S. Ct. 658, 78 L. Ed. 1182 (1934).

We conclude the Commission acted within its discretion in allowing the depreciation lives that had been set in 1993

to continue since US West did not carry its burden to show that the lives were incorrect. The Commission's decision was not arbitrary or capricious, as it was supported by relevant reasons which were in turn supported by substantial evidence. Agency action is arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous. *E.g., ITT Rayonier, Inc. v. Dalman*, 122 Wn.2d 801, 809, 863 P.2d 64 (1993). Under the statutes, the Company had the burden to show the need for change, and the Commission had the right to look to the former lives in deciding the correct depreciation rate. RCW 80.04.130(2), 80.04.350. We find no abuse of discretion in the Commission's decision.

## CONSTITUTIONAL ISSUE

US West argues that by its refusal to allow a fair opportunity for the recovery of its depreciation expenses, the Commission forces US West to provide telephone service at below-cost prices violating the federal and state constitutions. The Superior Court held that, at this point in time, it is mere speculation to assert that US West will be denied an opportunity to recover its expenses and return on capital and, under United States Supreme Court authority, the constitutional challenges must fail. We agree.

The Supreme Court has held that the guiding principle in rate cases has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so "unjust" as to be confiscatory. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989); *see also POWER*, 104 Wn.2d at 812. The Court has consistently used the "end result" test to determine if rates are confiscatory. The petition to the Commission in this case did not seek to change customer rates; it sought permission

to implement changes in its accounting procedures. The Supreme Court has consistently held that it is the total effect of a rate order which is subject to a constitutional confiscation claim, not the methodology used to arrive at the rate. *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S. Ct. 281, 88 L. Ed. 333 (1944); *Duquesne Light Co.*, 488 U.S. at 314; *see also Ohio Edison Co. v. Public Utils. Comm'n*, 63 Ohio St. 3d 555, 589 N.E.2d 1292, 1298-99 (1992).

In *Duquesne Light Co.*, 488 U.S. at 310, 314, the Court stated:

> We also acknowledged in [*Hope Natural Gas Co.*, 320 U.S. 591 (1944)] that all of the subsidiary aspects of valuation for rate-making purposes could not properly be characterized as having a constitutional dimension, despite the fact that they might affect property rights to some degree. Today we reaffirm these teachings of *Hope Natural Gas*: "[I]t is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry . . . is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."
>
> . . . .
>
> [A]n otherwise reasonable rate is not subject to constitutional attack by questioning the theoretical consistency of the method that produced it . . . . The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties . . . . Inconsistencies in one aspect of the methodology have no constitutional effect on the utility's property if they are compensated by countervailing factors in some other aspect.

Additionally, US West's argument that it might not be able to recover its investment in future years if competition becomes price constraining before its older plant is depreciated appears from this record to be entirely speculative. The record reflects that the Company's rate comparisons fail to show that in Washington the Company is not achieving full and timely capital recovery. The evidence is

that US West has always achieved full capital recovery in this state. The record supports the Commission's conclusion that the "remaining life depreciation method," combined with either ELG or with VG, allows the Company the opportunity to recover its investment. The Commission concluded, based on the record, that the Company has achieved proper and adequate recovery. US West offered no evidence the Commission found to be credible that it will not recover its capital investment in the future. The evidence supports the Commission's conclusion that current lives already reflect the anticipated effects of approaching competition and that lives may be adjusted in the future as needed. Under remaining life, if estimates upon which depreciation schedules are premised prove erroneous, they may be corrected in midcourse in a way that assures the full cost of the asset will ultimately be recovered. *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 361. As noted above, the Commission concluded that the speed at which competition will develop, how effective it will be and the effect on technological obsolescence are unknown. This conclusion is supported by testimony.

US West had the burden to establish with "clarity and definiteness" that a Commission rate order results in confiscation. *Lindheimer*, 292 U.S. at 164; *State ex rel. Showalter v. Goodyear*, 30 Wn.2d 834, 844, 194 P.2d 389 (1948). US West has not made this showing on this record. With regard to the state constitutional argument, the same analysis favors the Commission's position. There has been no showing on this record that there has been any taking of any property interest at this point in time; any argument on that issue is conjectural. In addition, US West has not shown any indication that Washington's prior law has afforded greater protections in the rate-making setting than are afforded under the federal constitution. US West has made no showing on this record that the Commission failed to regulate in a manner which allows the utility a

fair opportunity to recover its costs and to earn a reasonable return.

## MOTIONS TO STRIKE

The Commission's final order in this case and in the rate case were issued on April 11, 1996. William Easton, an employee of US West, submitted declarations dated April 19 and April 26, 1996, to the Superior Court stating how the 1996 three-way meetings with the Commission and the FCC (the triennial represcription process) regarding negotiating new depreciation lives were progressing. The Commission responded with a declaration from a Commission employee about the progress of negotiations. US West then responded with further declarations. TRACER moved to strike the extrarecord evidence, and the Superior Court struck "[a]ll evidence (from all parties) regarding how the 1996 triennial represcription process is proceeding." Clerk's Papers at 1133. US West has again included the April 1996 declarations of William Easton as appendices to its briefing to this Court. The Commission, Public Counsel and TRACER have moved to strike these declarations.

■■ ■■ Although in nonadministrative proceedings the finder of fact is the trial court, in administrative proceedings the facts are established at the administrative hearing and the superior court acts as an appellate court. *Waste Management*, 123 Wn.2d at 633 (citing RCW 34.05.558). The superior court does not take evidence or hear new issues unless the matter falls within the statutory exceptions of RCW 34.05.554 and .562. *Waste Management*, 123 Wn.2d at 633.

RCW 34.05.558 provides that judicial review of disputed facts shall be conducted by the court and must be confined to the agency record unless supplemented by additional evidence allowed by the Administrative Procedure Act. RCW 34.05.562 provides that the court may receive evidence in addition to that in the agency record only if it relates to the validity of the agency action at the time it was taken

*and* is needed to decide disputed issues regarding: (1) improper constitution as a decision-making body or grounds for disqualification of those taking the agency action; (2) unlawfulness of procedure or of decision-making process; or (3) material facts in rule making, brief adjudications, or other proceedings not required to be determined on the agency record.

All the alleged events described in Mr. Easton's declaration took place in March and April 1996, after the Commission records in the depreciation case and in the rate case were closed. The declarations do not include any evidence which relates to the validity of the Commission's action at the time it was taken. Additionally, the proferred declarations do not meet other criteria of RCW 34.05.562. The trial court properly granted the motions to strike these declarations as not properly before the court. This Court also grants the motions to strike the declarations of all parties and any other responsive matter attempting to describe the 1996 triennial represcription process. As the moving parties point out, if US West has a complaint about the 1996 triennial represcription process, that is a matter to be considered in a separate proceeding. The conflicting declarations have not been subject to any fact-finding inquiry and should not be before this Court.

We also grant the motions of Public Counsel and TRACER to strike the 1975 letter from the Chairman of the American Institute of Certified Public Accountants (AICPA), and we additionally note that the quote from that letter included in US West's brief is both incomplete and misleading.[9]

## CONCLUSION

We affirm the decision of the Superior Court which af-

---

[9]US West's brief to this Court refers to the AICPA letter and states:

Finally, the AICPA itself has recognized that, in transitioning from Vintage Group to Equal Life Group, "it would be theoretically desirable, where a company has the ability to do so, to implement ELG *for all its plant* as of an announced effective date."

firmed the order of the Commission. The Commission acted within its statutory authority and articulated reasons for its decisions, which were supported by substantial evidence in the administrative record.

DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON, MADSEN, ALEXANDER, TALMADGE, and SANDERS, JJ., concur.

Revised Br. of Appellant at 40. The AICPA letter actually states in part:

> In response to [the FCC's] request for comment as to whether ELG, if adopted . . . should be phased in over period [sic] of years . . . we offer the following:
>
> . . . .
>
> 2. While it would be theoretically desirable, where a company has the ability to do so, to implement ELG for all of its plant as of an announced effective date, **we recognize that the concurrent increase in revenue requirements would make it impractical to institute such change across-the-board. Accordingly, we believe that a phase in process** such as that proposed by AT&T, assuming a reasonable expectation of obtaining concurrent rate relief, would achieve a proper matching of costs and revenue as contemplated in the Addendum to Accounting Principles Board Opinion No. 2 and **would accordingly be consistent with generally accepted accounting principles.**

Clerk's Papers at 800-01 (emphasis added by US West when it retyped the letter on November 16, 1994).