[No. 64822-1. En Banc.]
Argued June 24, 1997. Decided December 24, 1997.
US WEST COMMUNICATIONS, INC., *Appellant*, v. UTILITIES AND TRANSPORTATION COMMISSION, *Respondent*.

78

*Perkins Coie*, by *Sherilyn Peterson*; and *Edward T. Shaw*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Gregory J. Trautman* and *Robert F. Manifold, Assistants*, for respondent.

*Davis Wright Tremaine*, by *Daniel M. Waggoner* and *Gregory J. Kopta*; *Ronald Roseman*; *Richard A. Finnigan*; *Schwerin, Burns, Campbell & French*, by *Dmitri L. Iglitzin*; *GTE Northwest-Legal Department*, by *Richard E. Potter* and *Timothy J. O'Connell*; *A. Timothy Williamson* (*Sara Miller* and *Michael Shortly*, of counsel), for appellant intervenors.

*Ater, Wynne, Hewitt, Dodson & Skerritt*, by *Arthur A. Butler* and *Stephen J. Kennedy*; *Miller, Nash, Wiener, Hager & Carlsen*, by *Clyde H. MacIver* and *Brooks E. Harlow* (*Roselyn Marcus*, of counsel), for respondent intervenors.

GUY, J. — This case involves an appeal by a telecommunications company of a Washington Utilities and Transportation Commission decision denying the company's petition for an increase in telephone rates. We affirm the order of the Commission.

## FACTS

On February 17, 1995, US West Communications, Inc. (US West or the Company) petitioned the Washington Utilities and Transportation Commission (Commission) for a

statewide general rate increase for telephone services.[1] US West sought approximately $204 million a year in additional revenues, phased in over four years. The order indicates the Commission heard from 52 expert witnesses and received nearly 800 exhibits, comprising over 10,000 pages of written testimony and documentation. The record also includes more than 4,000 pages of transcript testimony occurring over several weeks. In addition to US West, Commission Staff, and Public Counsel,[2] many other parties[3] participated in the proceeding. The Commission held seven days of public hearings to receive testimony from customers in different cities throughout Washington.

During the rate proceedings, the Commission decided two motions which are challenged by US West in this appeal. The Commission denied US West's request to exclude consideration of revenue derived from the publication of yellow pages advertising. The Commission also held that the issues recently considered in a prior depreciation case need not be relitigated in the rate case.

In its 137-page final dispositive order, the Commission denied the request for increased rates and found, instead, that the Company was overcollecting approximately $91.5 million a year from Washington telephone customers. The Commission directed the Company to reduce rates by that amount.

[1]US West is a provider of telecommunications services in this state and is subject to regulation by the Commission. The Commission is authorized by RCW 80.01.040(3) to regulate in the public interest the rates, services, facilities, and practices of public service companies including telecommunications companies. The Commission appoints such accounting, engineering and expert assistants as necessary to carry out the work of the Commission. RCW 80.01.030.

[2]Public Counsel refers to the Public Counsel Section of the State Attorney General's office. Public Counsel represents the people of the state in utility regulatory matters as a statutory party. RCW 80.01.100, 80.04.510.

[3]During the pendency of this case, many parties were granted intervenor status. The parties which submitted briefs to this Court, in addition to US West Communications, Inc., Washington Utilities and Transportation Commission, and Public Counsel, include: MCI Telecommunications Corporation; MCI Metro Access Transmission Services, Inc.; AT&T Communications of the Pacific Northwest, Inc.; American Association of Retired Persons; Metronet; and Telecommunications Ratepayers Association for Cost-based and Equitable Rates.

The most relevant findings for the purposes of the issues presented to this Court (stated in abbreviated form) are as follows:

- US West's customer service has deteriorated significantly since 1991. There are significant problems with both repair and installation services. US West representatives have repeatedly promised service would improve but performance has worsened, measured by objective criteria.

- "Team Bonus Awards" and merit payments for US West employees are tied to standards putting a primary emphasis on the Company's financial performance to the point where complete failure to achieve customer service goals may be totally offset by superior Company financial performance. Such standards fail to tie bonus payments to customer service goals and permit emphasis on financial performance to the exclusion of customer service.

- Setting the Company's authorized rate of return on equity at the low end of the reasonable range, and allowing the Company to petition for adjustment upon a showing of improved stable customer service, will provide incentive to the Company to improve its customer service performance.

- US West voluntarily stipulated, as a condition of its predecessor's merger with two other companies into US West, that the merger would have no effect upon the imputation of yellow pages earnings. US West Direct, the publisher of the yellow pages, benefits substantially from its existing relationship with US West and from the former integrated operation as a part of Pacific Northwest Bell (PNB). Yellow pages classified advertising directory publication constitutes a former regulatory asset of the Company. Neither US West nor its predecessor, PNB, received compensation

for transfer of the yellow pages publication to US West Direct, and US West receives no licensing fee for directory publication although it receives a small fee for basic subscriber information. US West Direct's relevant yellow pages advertising excess revenues during the test year were imputed by the Commission at $50,934,378 to US West's net operating income.

- Test year net operating income after all adjustment is $204,749,579.

- US West's adjusted Washington intrastate rate base is $1,561,793,482.

- A rate of return in the range of 9.367% to 9.88% on US West's rate base will maintain its credit and financial integrity and will enable it to acquire sufficient new capital at reasonable terms to meet its service requirements. Setting the authorized return at 9.367% with the opportunity to increase the rate of return to 9.627% upon satisfactory resolution of customer service quality problems will provide incentive to US West to improve its service quality. The appropriate overall rate of return for US West is therefore 9.367%.

- Costs of providing service are properly shown in a study of total service long-run incremental costs. The Company's cost studies do not appropriately measure the Company's incremental costs of providing service. Costs of the local loop are not properly included in the incremental cost for local exchange service. The Hatfield Model cost study identifies the Company's true costs of providing local service more closely than the Company's study.

- The Company did not demonstrate that it faces effective competition sufficient to constrain prices in any market for its regulated services.

- Centrex service[4] tariffs that effect unbundling of the Centrex elements, price the highest-priced Centrex line at the level of the private line NAC, and remove the station location requirement, will achieve the unbundling goals identified in prior Commission orders and will be fair, just and reasonable.

Administrative Record (AR) at 1779-1915 (Fifteenth Supplemental Order: Commission Decision and Order Rejecting Tariff Revisions; Requiring Refiling — hereafter Order).

The Order denied US West's proposal to increase urban residential phone rates from the statewide average of $10.50 to $21.85 and rural residential rates to $26.35. The Commission found that the incremental cost of local service is less than $5.00 per month and that, even if the entire incremental cost of the "loop" (the facilities needed for the connection between the central office and the consumer's telephone which also carry long distance and specialized services, such as voice mail, as well as local service) is allocated to the local ratepayer, the price covers that cost. The Commission concluded there was no local service subsidy. The Commission directed the Company to establish a statewide residential rate of $10.50 per month, the average rate presently in effect. The Commission found that rate covers the cost of local residential service and provides a substantial contribution to shared and common costs.

With regard to competition, the Commission stated:

> [US West] argues that it needs to meet existing and impending competition with sharply higher rates for residential customers, and lower rates for other, more competitive services. While higher local rates simply are not supported by the record in this proceeding, the Commission agrees that the Company needs pricing flexibility to respond to competition

---

[4]Centrex is an equipment-intensive service that includes a package of telephone-related features. Some of the Centrex services have been classified as competitive and others remain classified as noncompetitive features.

when it appears. As a result, the Commission is authorizing the Company to file banded rates for any service it chooses. The rate set in this order will be the top end of the band. The Company may choose any level above incremental cost for the bottom of the band . . . . This flexibility gives the Company the ability to drop prices where competition requires, while restraining its ability to raise the rates of captive customers. Of course, the Company is always free to propose increases in the rate caps if it can prove increased costs.

AR at 1788-89.

US West appealed the Commission's Order, and the Superior Court affirmed the decision of the Commission. We accepted direct review.

The Company argues to this Court that: the Commission erred in imputing revenue from the publication of the yellow pages advertising to the Company's net operating income; the Commission was required to allow US West to introduce the depreciation evidence introduced in the depreciation docket again in this rate case; US West had insufficient notice that the Commission was going to consider the issue of the Centrex service; the Commission's rejection of US West's "cost studies" was error; the Commission lacked authority to lower the Company's rate of return based on evidence of poor service quality; the Commission erred in disallowing the "team and merit" salary bonuses from the Company's expenses; and the Commission did not have the authority to order US West to provide a customer service program.

## BURDEN OF PROOF AND STANDARD OF REVIEW

In the rate setting proceeding before the Commission, the burden to demonstrate the need for increased rates was on US West. RCW 80.04.130(2) provides:

At any hearing involving any change in any schedule, classification, rule or regulation the effect of which is to increase any rate, charge, rental or toll theretofore charged, the burden of proof to show that such increase is just and reasonable shall be upon the public service company.

■ Judicial review of the Commission's actions are reviewed under the standards set forth in the Administrative Procedure Act, RCW 34.05. *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 667, 911 P.2d 1301 (1996); *People's Org. for Wash. Energy Resources (POWER) v. Utilities & Transp. Comm'n*, 104 Wn.2d 798, 812, 711 P.2d 319 (1985). Specifically, review of the Commission's determination is governed by RCW 34.05.570. *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 869 P.2d 1034 (1994).

The burden of demonstrating the invalidity of agency action is on the party asserting invalidity. RCW 34.05.570(1)(a). RCW 34.05.570(3) provides in relevant part that the court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:

(a) The order . . . is in violation of constitutional provisions on its face or as applied;

(b) The order is outside the statutory authority or jurisdiction of the agency . . .

(c) The agency has engaged in unlawful procedure or decision-making process . . .

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . .

(f) The agency has not decided all issues requiring resolution by the agency . . .

. . . .

(h) . . . or

(i) The order is arbitrary or capricious.

■ ■ The Commission decides questions of fact, and review by this Court is of the Commission's findings and not a review of the superior court's decision. *Waste Management*, 123 Wn.2d at 633; *Inland Empire Distrib. Sys., Inc. v. Utilities & Transp. Comm'n*, 112 Wn.2d 278, 282, 770

P.2d 624, 87 A.L.R.4TH 627 (1989). The Commission's findings of fact are reviewed under a substantial evidence standard. *In re Electric Lightwave, Inc.*, 123 Wn.2d 530, 542, 869 P.2d 1045 (1994). Under RCW 80.04.430, the Commission's findings are prima facie correct.

■ The Commission has broad generalized powers in making rate-setting decisions, which are often highly technical. *Jewell v. Utilities & Transp. Comm'n*, 90 Wn.2d 775, 776, 585 P.2d 1167 (1978). This Court generally accords substantial deference to the Commission's decisions, although it does not defer to the Commission the power to determine the scope of its own authority. *Electric Lightwave*, 123 Wn.2d at 540. In *POWER*, 104 Wn.2d at 812, we reiterated that courts are not at liberty to substitute their judgment for that of the Commission in rate cases and that, within a fairly broad range, regulatory agencies exercise substantial discretion in selecting the appropriate rate-making methodology. *See also Cole v. Utilities & Transp. Comm'n*, 79 Wn.2d 302, 309, 485 P.2d 71 (1971) (burden of proof is on the appellant to show the findings and conclusions of the Commission are unlawful, unsupported by the evidence, arbitrary or capricious—and this is especially true when the issues involve complex factual determinations peculiarly within the expertise of the Commission).

When a statute is ambiguous and when the statute is within the field of expertise of the Commission, this Court will afford significant deference to the Commission's determination. *ARCO Prods. Co. v. Utilities & Transp. Comm'n*, 125 Wn.2d 805, 811-12, 888 P.2d 728 (1995); *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 799, 920 P.2d 581 (1996).

■ In considering the complex case before us, we read all of the applicable statutes together and have in mind the policy of the State of Washington as enunciated in the telecommunications statute. The policy of this state is to

(1) Preserve affordable universal telecommunications service;

(2) Maintain and advance the efficiency and availability of telecommunications service;

(3) Ensure that customers pay only reasonable charges for telecommunications service;

(4) Ensure that rates for noncompetitive telecommunications services do not subsidize the competitive ventures of regulated telecommunications companies;

(5) Promote diversity in the supply of telecommunications services and products in telecommunications markets throughout the state; and

(6) Permit flexible regulation of competitive telecommunications companies and services.

RCW 80.36.300.

## IMPUTATION OF YELLOW PAGES REVENUE

**Issue:** May the Commission, for rate-making purposes, consider excess revenue derived from yellow pages advertising in establishing an appropriate revenue requirement for US West?

### History and Facts

Simply put, in determining US West's net operating income, the Commission treated some of the profit made by US West Direct as if it were income received by US West. Because US West transferred its lucrative yellow pages business to its sister company, US West Direct, for inadequate compensation, the Commission imputed (for accounting purposes) the "excess revenue" (above a set return to US West Direct) to US West. US West challenges the authority of the Commission to impute such income for the purpose of setting the rates to be charged to telephone customers.

Historically, US West and its predecessor, PNB, published telephone directories which included the yellow pages advertising. The companies then included revenues from

the advertising in their regulated results of operations. The telephone directory business is a very lucrative business, and US West acknowledges that revenues collected from selling yellow pages advertising far exceed the costs of producing the advertising and the directories.

In 1983, PNB (now US West) filed an application with the Commission under RCW 80.12 (the transfer of property statute) and RCW 80.16 (the affiliated interests statute) to transfer its Washington yellow pages publishing business to Landmark Publishing Company. Because property of a utility was to be transferred and because the two companies were affiliates,[5] the transfer required the approval of the Commission. The Commission did approve the transfer, but it did not approve the compensation to be paid under the agreement. The phone company represented that the transfer of the yellow pages was "an appropriate and beneficial financial arrangement for PNB and its ratepayers because the Agreement effectively preserves a significant contribution from Yellow Page revenue to PNB's earnings." Clerk's Papers (CP) at 765. The Commission held that the transactions between PNB and US West Direct were not arm's-length dealings and stated that the Commission's primary concern was that PNB not undervalue the advertising business in the agreement with its affiliate. The Commission retained jurisdiction and reserved the right to determine reasonable revenues and expenses, together with the treatment of such items, in any formal proceeding before the Commission dealing with the Company's results of operation for rate-making purposes.

In a later proceeding, the Commission specifically disapproved the fee to be paid to the phone company by US West Direct, finding the fee for the yellow pages business to be unreasonably low. The Commission found that "[t]he difference between the publishing fee under the publishing agreement and the reasonable value of the right to publish

---

[5]Landmark was the wholly-owned subsidiary of US West, Inc. and the parent of US West Direct. US West, Inc. is the parent of both US West and US West Direct.

the 'yellow pages' constitutes unreasonable compensation to US West Direct." CP at 1414. The Commission held in its Order that the appropriate revenue to be attributed to the yellow pages transfer would be determined in the next general rate proceeding, and it retained jurisdiction to establish the appropriate publishing fee under the continuing supervisory control conferred over affiliate transactions by RCW 80.16.050.

The Commission did explain in that order that a fair contract between the Company and its affiliate for the *sale* of the asset would put an end to any imputation of revenue. The Commission stated that if the phone company and US West Direct intended a permanent transfer of the yellow pages, treatment as a sale may be most appropriate and explained:

> Such treatment would allow for determination of consideration at the time of transfer that would fairly compensate PNB . . . . Such a result is appropriate if US West Direct seeks to ultimately acquire all of the opportunity for profit. Treatment as a sale is very likely to reflect a result that might have been achieved by parties bargaining at arms length. Also, no further supervision by this Commission of the publishing enterprise of an unregulated company would be necessary if the transaction is treated as a sale. US West Direct would be free to manage its business without involvement in future proceedings concerning the proper levels of compensation to PNB. PNB would have the reasonable value of its asset.

CP at 1424.

In 1989, the Commission filed a complaint against US West, alleging that its earnings were excessive. The complaint was settled by an agreement in which US West agreed that a part of US West Direct's yellow pages advertising revenues should be imputed to regulated revenues of US West. This settlement agreement is referred to by the parties as the "AFOR" agreement because it stipulated to an "alternative form of regulation" for five years. Later in 1989, during a proceeding regarding a merger, US West again agreed that yellow pages directory revenues

would be imputed until December 31, 1994, and then "continue to be imputed accordingly unless and until altered by subsequent order of the Commission." CP at 1451.[6]

The AFOR agreement ended on December 31, 1994, and this general rate case was filed shortly thereafter. During this present rate case, US West sought to have the Commission exclude from consideration in setting the Company's rates any consideration of the profits made by US West Direct from publishing the yellow pages directories. The Commission refused and held that some imputation would continue.

## Discussion

US West argues that the Commission lacks the statutory authority to impute to US West some of the yellow pages directory revenues earned by its affiliate, US West Direct. US West argues that despite its past acquiescence in treating revenues from advertising as part of regulated operations, the Commission cannot count as revenue to US West the revenue from an unregulated, nonutility affiliate.

The Commission responds that US West transferred its lucrative yellow pages business (developed while it enjoyed a monopoly environment) to its unregulated affiliate in return for grossly inadequate consideration, and that the Commission acted within its broad statutory authority in imputing the excess profits of the yellow pages business to US West. The Commission argues it has authority to impute such excess revenues pursuant to several statutes, and that the imputation of yellow pages revenues has been upheld by every jurisdiction that has considered the mat-

---

[6]A number of parties before this Court argue that US West should be held to its prior agreements that revenues from yellow pages advertising should be imputed to US West. They rely on estoppel or waiver arguments. Because we decide the Commission did have the authority to impute income from the publishing of the yellow pages to US West, we find it unnecessary to decide whether US West previously waived the right to challenge the imputation based on its former agreements. *See In re Electric Lightwave, Inc.*, 123 Wn.2d 530, 542, 869 P.2d 1045 (1994).

ter. Under the Commission Order, no revenue is collected from US West Direct, nor is that affiliate subject to regulation; the Order concerns only what revenue is imputed to US West.

Public Counsel and the American Association of Retired Persons (AARP) argue that the Commission has statutory authority to impute income to US West for rate-setting purposes under the affiliated interests statute, RCW 80.16; under its general power to determine fair, just and reasonable rates, RCW 80.36; under the powers to regulate in the public interest the rates, services and practices of utilities, RCW 80.04; and under the power to regulate the transfer of utility assets, RCW 80.12. Telecommunications Ratepayers Association for Cost-based and Equitable Rates (TRACER), MCI, MCI Metro and AT&T essentially join in the positions of the Commission, Public Counsel and AARP. They contend the Commission properly imputed the excess revenue from the yellow pages business to US West because the utility has transferred away a valuable asset to an affiliated company without obtaining fair value, and that the imputation serves to correct US West's revenues to produce rates that are fair and reasonable. They argue that US West has provided no reason to depart from the decisions of all other state appellate courts uniformly allowing the imputation of yellow pages revenues.

We conclude the Commission has statutory authority to impute excess yellow pages revenue in calculating US West's revenue requirement under both the affiliated interests statute and under its statutory rate-making authority.

RCW 80.16, the affiliated interests statute, grants the Commission authority over contracts between any public service company and its affiliate. US West and US West Direct are affiliated interests. RCW 80.16.010. Under RCW 80.16.020, contracts between a public service company and any affiliated interest must be approved by the Commission. RCW 80.16.020 provides in part:

No contract or arrangement providing for the furnishing of

management . . . or similar services, and no contract or arrangement for the purchase, sale, lease or exchange of any property, right, or thing, or for the furnishing of any service, property, right, or thing . . . made or entered into between a public service company and any affiliated interest . . . shall be valid or effective unless and until such contract or arrangement shall have received the approval of the commission . . . . The commission shall approve such contract or arrangement . . . only if it shall clearly appear and be established upon investigation that it is reasonable and consistent with the public interest; otherwise the contract or arrangement shall not be approved.

As noted above, the Commission found that US West was receiving insufficient consideration for the transfer of the yellow pages business, and the Commission disapproved the fee to be paid by US West Direct because it was unreasonably low. The Commission held that the appropriate revenue to be attributed to the yellow pages transfer would be determined in the next general rate proceeding, and it retained jurisdiction to establish the appropriate publishing fee under the continuing supervisory control conferred over affiliate transactions by RCW 80.16.050, which provides:

The commission shall have continuing supervisory control over the terms and conditions of [affiliated interest transactions] so far as necessary to protect and promote the public interest . . . . The fact that the commission shall have approved entry into such [affiliated interest transactions] shall not preclude disallowance or disapproval of payments made pursuant thereto, if upon actual experience under such contract or arrangement, it appears that the payments provided for or made were or are unreasonable. Every order of the commission approving any such contract or arrangement shall be expressly conditioned upon the *reserved power of the commission to revise and amend the terms and conditions thereof, if, when and as necessary to protect and promote the public interest.*

(Emphasis added.)

We conclude this language is broad enough to cover

imputation, since imputation of revenue is included in the power to revise and amend the contract between the two affiliates. Furthermore, RCW 80.16.030 authorizes the Commission to disallow unreasonable compensation to an affiliated company for purposes of rate making. RCW 80.16.030 provides in relevant part:

> In any proceeding, whether upon the commission's own motion or upon complaint, involving the rates or practices of any public service company, the commission may exclude from the accounts of such public service company *any payment or compensation to an affiliated interest* for any services rendered or property or service furnished, as above described, under existing contracts or arrangements with such affiliated interest unless such public service company shall establish the reasonableness of such payment or compensation. In such proceeding *the commission shall disallow such payment or compensation, in whole or in part, in the absence of satisfactory proof that it is reasonable in amount.* In such proceeding *any payment or compensation may be disapproved or disallowed by the commission,* in whole or in part, unless satisfactory proof is submitted to the commission of the cost to the affiliated interest of rendering the service or furnishing the property or service above described.

(Emphasis added.)

US West argues that the limited purpose of this statute is to give the Commission authority to examine contracts between affiliates only when the utility is purchasing from the affiliate and proposes to include the affiliate's charges in its regulated results of operations. It argues that US West is "paying" US West Direct nothing and not including any expense in its revenue requirement calculation. The Company also argues that the sole remedy available to the Commission, if proof of the reasonableness of an affiliate's charge is inadequate, is to disallow—in a rate case —in whole or in part the "payments" to the affiliate. We disagree. The statute states that the Commission may

disapprove or disallow any payment or any "compensation"[7] to the affiliate if unreasonable.

The Commission accurately contends that it did precisely what the statutes authorize: it disallowed, for rate-making purposes, the unreasonable compensation US West provided to its affiliate, US West Direct, when it transferred the profitable yellow pages business to US West Direct for grossly inadequate consideration. No one represents to this Court that US West Direct has paid US West the fair price for the yellow pages business. US West Direct paid a publishing fee to PNB from 1984 to 1988—but a fee the Commission found to be unreasonably low. It is undisputed that no fee has been paid to US West since 1988. We conclude the Commission's use of the statute comports with the rationale underlying the affiliated interests statute.

The general rationale for the Commission's authority to review transactions between affiliated companies is fear of collusion in the absence of arm's-length dealings. *Waste Management*, 123 Wn.2d at 638. It does not matter under these statutes whether the utility paid the affiliate too much money for too little service or property, or whether (as here) the utility gave the affiliate something of far greater value than the affiliate paid for in return. The effect in either situation is to give to the shareholders of the affiliate something of value at the expense of the ratepayers of the utility. In an order entered when the yellow pages business was transferred to US West Direct, the Commission concluded:

> RCW 80.16.020 is most reasonably interpreted as contemplating that the Commission has the power to exercise jurisdiction and examine all such transactions to determine whether or not they are in the public interest. That statute refers to any "purchase, sale, contract . . . between a public service

---

[7]"Compensation" is defined as "something that constitutes an equivalent or recompense." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 463 (1986). Black's Law Dictionary defines "compensation" as "making whole; giving an equivalent or substitute of equal value." BLACK'S LAW DICTIONARY 283 (6th ed. 1990).

company and any affiliated interest." Not only is the Commission exercising jurisdiction consistent with the clear wording of the statute, but this interpretation is consistent with RCW 80.16.050, which gives the Commission power to disallow or disapprove payments made pursuant to any such contract if they are unreasonable, and reserves to the Commission power to revise or to amend terms and conditions of contracts "if, when and as necessary to protect and promote the public interest."

CP at 1419.

We view the affiliated interest statute as giving the Commission the authority to impute income to rectify the effects of the transfer of a valuable asset by the utility to its affiliate for inadequate consideration.

We also conclude the Commission has the statutory authority under RCW 80.36 to impute income to US West for rate-setting purposes and find no contradiction between the two statutes. RCW 80.36.080 provides that all rates shall be fair, just, reasonable and sufficient. RCW 80.36.140 provides:

Whenever the commission shall find, after a hearing had upon its own motion or upon complaint, that the rates, charges, tolls or rentals demanded, exacted, charged or collected by any telecommunications company for the transmission of messages by telecommunications . . . or that the rules, regulations or practices of any telecommunications company affecting such rates, charges, tolls, rentals or service are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in anywise in violation of law . . . the commission shall determine the just and reasonable rates, charges, tolls or rentals to be thereafter observed and in force, and fix the same by order as provided in this title.

The Commission argues that US West's decision to transfer its lucrative yellow pages operations to its affiliate for inadequate consideration is a "practice"—and an unreasonable practice—which directly affects the rates it charges for regulated services. We agree. The Commission explains that at the time of the transfer of the yellow pages

business, it intended neither to regulate the yellow pages business nor to require PNB to remain in that business; rather, the concern was that the utility not transfer the business—an asset created by ratepayer funds during the utility's de facto telephone monopoly—to its own affiliate for an inadequate price, to the harm of the ratepayers. The imputing of revenue is the result of the fact that the Company gave away a lucrative ratepayer-funded asset to an unregulated affiliate in return for little or nothing.

The Commission has broad authority to regulate the practices of public utilities. *Tanner Elec.*, 128 Wn.2d at 666; *POWER*, 104 Wn.2d at 812; *Jewell*, 90 Wn.2d at 776. In its Order in this case the Commission explained:

> Utilities may have the power to subdivide the integrated utility operations and divest for their own organizational goals or profit objectives any discrete, divisible, and potentially profitable aspect of that operation. Imputation is entirely consistent with the purpose of regulation as a tool to minimize adverse effects on such division and divestiture when those circumstances occur.

AR at 1817.

We agree that the use of imputation is within the statutory authority of the Commission in performing its duty to set reasonable rates.

US West also argues that RCW 80.04.270 prohibits imputation of revenue from the yellow pages advertising. That statute provides:

> *Any public service company engaging in the sale of merchandise or appliances or equipment* shall keep separate accounts, as prescribed by the commission, of its capital employed in such business and of its revenues therefrom and operating expenses thereof. The capital employed in such business shall not constitute a part of the fair value of said company's property for rate making purposes, nor shall the revenues from or operating expenses of such business constitute a part of the operating revenues and expenses of said company as a public service company. For purposes of this section, the providing of competitive telephone service, as defined in RCW 82.04.065,

shall not constitute the sale of merchandise, appliances, or equipment, unless the commission determines that it would be in the public interest to hold otherwise.

(Emphasis added.)

The Commission's Order responded to the Company's contention that RCW 80.04.270 applies, as follows:

Merchandise includes all goods which merchants usually buy and sell.[22] US WEST Direct is not a printing job shop, and the advertiser is not purchasing goods of any kind. The Commission finds that the advertiser is purchasing the service of having advertisements printed and distributed to every telephone subscriber. The advertiser has no property right in any printing, printed advertisement, or other physical property as a result of the advertisement. Thus there is no sale of merchandise, and the statute [RCW 80.04.270] is inapplicable.

[22]BLACK'S LAW DICTIONARY, 5TH ED. (1979), at 890.

AR at 1813.

Merchandise is not defined in the statute. The dictionary definition is "the commodities or goods that are bought and sold in business." WEBSTER'S, *supra*, at 1413.

The Commission's interpretation of the statute and the construction of yellow pages advertising as a service is reasonable. When businesses purchase yellow pages advertising, they are paying for the delivery of their name, phone number and advertisement to all telephone customers. This is a service and not merchandise, and RCW 80.04.270 is inapplicable.

US West also argues that the Commission treated Washington Natural Gas differently in a 1993 case than it is treating US West in this case. After examining the facts of both cases, we conclude the Commission's decision in the Washington Natural Gas case is not contradictory to the result here. In both cases the Commission expressed concern over plans to move only profitable enterprises out of regulated operations, to the detriment of the ratepayers.

US West makes a number of other arguments to support its contention that the Commission should not have imputed any revenue from the yellow pages publishing business. It argues that the Commission "unconditionally approved the transfer" of the yellow pages advertising assets to its affiliate. As explained above, the Commission did not "unconditionally" approve the transfer of the publishing business. It conditionally approved the transfer, retaining jurisdiction as allowed by statute to set a fair compensation in the next rate case. In *Graves v. Cascade Natural Gas Corp.*, 51 Wn.2d 233, 316 P.2d 1096 (1957), this Court explained that a contract between a utility and its affiliate is not necessarily void as between the parties to that contract pursuant to RCW 80.16, but rather that payments or compensation under such a contract may be disallowed by the Commission in computing rates. The power the Commission exercised here was not to void the contract between the contracting parties but to "revise and amend the terms and conditions" of the contract as necessary to protect the ratepayers. RCW 80.16.050.

US West also argues it should not be required to stay in the directory publishing business. The Company has not been ordered to stay in the directory publishing business. The record shows the Company has always been free to sell the business for a fair value.

US West further argues that it is entitled to earn its revenue requirement—prudent expenses plus a reasonable return on rate base for property dedicated to the public use. The Commission agrees but finds that the publishing business, which gained its value during monopoly years and on which a rate of return was earned, has been transferred for much less than its value and imputation may be used to rectify that transfer. We agree. Imputation does not keep the Company from earning its revenue requirement—it simply rectifies an unfair transfer.

US West argues it was prudent to divest itself of the advertising business to avoid a possible antitrust suit. The Commission is not objecting to the transfer; it is objecting

to the failure to obtain a fair price for transferring the asset. The Company also argues that to price services that are subject to competition below cost by subsidizing them with revenues from other services may violate the antitrust laws. First, the Commission concluded, and there has been no contrary showing on appeal, that price subsidies do not exist. Further, the record shows that US West has admitted that no legal action has been brought against US West or any other regional Bell telephone company alleging that the imputation of yellow pages revenues is anticompetitive or in violation of antitrust laws, in spite of many jurisdictions[8] imputing income.

US West also argues that imputation will stifle competition. None of the parties in this case which are competitors support US West's argument that imputation will harm competition. We consider this inquiry to be a matter of policy within the discretion of the Commission.

The Company also argues that it is being treated differently from other companies in the business and that the character of the asset as a "regulatory asset" does not give the Commission the right to impute income. The fact is that the Company is different from other companies competing for the business. The record shows that US West did not develop this lucrative business by its initiative, skill, investment or risk taking in a competitive market. Rather, it did so because it was the sole provider of local telephone service, and as such owned the underlying customer databases and had established business relationships with virtually all of the potential advertisers in the yellow pages. Therefore, the Commission reasonably concluded that the yellow pages business is quite unlike businesses of other unregulated companies which were developed in, or derive their profitability from, the competitive marketplace. The record indicates that the billing and

[8]The record indicates that US West, Inc. (the parent of US West and of US West Direct) has organized and operates US West Direct as a nonregulated business in many states. Thirteen of fifteen of US West's state regulatory jurisdictions impute US West Direct income into telephone company operations in setting rate levels.

collection service provided to US West Direct by US West is a valuable business advantage to US West Direct. The record also indicates that in contrast with potential publishing competitors, US West Direct's publishing enjoys a unique and direct benefit by being associated with the Company's regulated telecommunications services. The affiliated transactions of US West's competitors do not present an analogous public policy issue because competitors lack the formidable and historical dominance in the local exchange market that US West possesses.

In a case involving Mountain Bell's transfer of its yellow pages advertising to US West Direct, the phone company argued that the Commission had engaged in an unconstitutional taking of private property. The Colorado Supreme Court said:

> Mountain Bell argues that the publishing assets belong to its shareholders who took the risks to develop the publishing business. . . . [W]e reject Mountain Bell's characterization of its publishing operations as purely private. The directory publishing business was developed over the past fifty years within the protective shelter of Mountain Bell's monopoly of telephone service. The assets were included in the base upon which Mountain Bell was permitted to earn a return. Mountain Bell concedes that the Yellow Pages always have generated "supra competitive" profits. It is an exaggeration to say that Mountain Bell's shareholders took any significant risk in developing the directory publishing business, and we find the public interest in those assets to be beyond dispute.

*Mountain States Tel. & Tel. Co. v. Public Utils. Comm'n,* 763 P.2d 1020, 1027-28 (Colo. 1988) (citations omitted).

When Southwestern Bell Telephone Company transferred its yellow pages directory business to its unregulated affiliate without getting full value for the business, the Oklahoma Supreme Court stated:

> The Commission's concerns are well founded. They are most relevant when a regulated utility transfers assets to an unregulated affiliate at the assets' net book value and that unregulated affiliate uses the assets to earn revenues that

benefit only the shareholders of the parent holding company, not the ratepayers of the regulated utility. The ratepayers in that situation have, in essence, subsidized the shareholders of the parent company. In the present case the revenues and corresponding expenses of [the affiliate] have been imputed back to [the telephone company].

*Turpen v. Oklahoma Corp. Comm'n,* 769 P.2d 1309, 1327 (Okla. 1988) (footnote omitted). *See also State ex rel. Utils. Comm'n v. Southern Bell Tel. & Tel. Co.,* 307 N.C. 541, 299 S.E.2d 763, 765 (1983); *In re Northwestern Bell Tel. Co.,* 367 N.W.2d 655, 660-61 (Minn. Ct. App. 1985); *In re Rochester Tel. Corp. v. Public Serv. Comm'n,* 87 N.Y.2d 17, 660 N.E.2d 1112, 1116-18, 637 N.Y.S.2d 333 (1995) (Imputation is proper to compensate ratepayers for the company's imprudence in allowing free transfer of its valuable assets to affiliates; the court noted that nothing in the Constitution requires the shareholders have a free ride on the back of the ratepayers. A utility should receive reasonable remuneration when its affiliates benefit from it.). Further authority from other jurisdictions lends support to the Commission's decision regarding the revenue imputation issue.[9]

Public Counsel and AARP argue that if US West believes the imputation has been sufficient, it should petition the Commission to perform a valuation of the asset that was transferred (the publishing right) and to determine the value that has been received from imputation to determine whether imputation should continue. Public Counsel and AARP state that US West has refused this invitation. The Commission states in its Order that "[n]either never-

---

[9]*General Tel. Co. v. Idaho Pub. Utils. Comm'n,* 109 Idaho 942, 712 P.2d 643, 651 (1986); *In re US W. Communications, Inc.,* 165 Pub. Util. Rep. 4th 235, 250-51 (Utah Pub. Serv. Comm'n Nov. 6, 1995); *Alabama Pub. Serv. Comm'n v. South Cent. Bell Tel. Co.,* 130 Pub. Util. Rep. 4th 92, 93-96 (Ala. Pub. Serv. Comm'n Feb. 13, 1992); *In re Rates & Charges of Mountain States Tel. & Tel. Co. v. Corporation Comm'n,* 99 N.M. 1, 653 P.2d 501, 505 (1982); *In re New Eng. Tel. & Tel. Co.,* 157 Pub. Util. Rep. 4th 112, 163-65 (Vt. Pub. Serv. Bd. Oct. 5, 1994); *In re South Cent. Bell Tel. Co.,* 121 Pub. Util. Rep. 4th 338, 347-50 (La. Pub. Serv. Comm'n Apr. 1, 1991); *Pacific NW Bell Tel. Co. v. Katz,* 121 Or. App. 48, 853 P.2d 1346, 1348-49 (1993); *In re N.Y. Tel. Co. v. Public Serv. Comm'n,* 72 N.Y.2d 419, 530 N.E.2d 843, 845, 534 N.Y.S.2d 136 (1988).

ending imputation nor seizure of income is contemplated or attempted here. The profits of non-utility affiliates are not touched in any way. They are merely imputed to [US West] as is permitted by law." AR at 1816. Similarly, as noted above, the Commission in its ruling regarding the transfer of the publishing rights explained that if the transaction were treated as a sale of the asset and a fair price paid, then imputation of revenue would cease.

### Conclusion on Imputation Issue

We hold US West has not carried its burden of demonstrating the invalidity of the Commission's decision regarding the imputation of revenue. The yellow pages publication business is a lucrative revenue-producing asset which was developed as a result of the Company's long, de facto monopoly dominance of the telephone business in Washington. The transfer of an undervalued asset constitutes a payment or compensation prohibited by the affiliated interests statute, RCW 80.16. The Commission acted within its discretion conferred by that statute and within its authority to set just and reasonable rates pursuant to RCW 80.36.140 when it imputed yellow pages revenues to US West. We note that under the Commission's Order, the imputation is not necessarily permanent, and the Commission's prior orders show that when the Company has shown it has received fair compensation from its affiliate for the value of the asset it transferred, imputation may cease. We hold the Commission was within its statutory authority to impute excess revenues from the publishing of the yellow pages to the revenue of US West. US West may petition the Commission for an end to imputation if and when it can show it has received fair value for the transfer of the asset.

### DEPRECIATION EVIDENCE

**Issue:** Did the Commission err in refusing to allow

depreciation evidence to be admitted during the rate proceeding?[10]

## Facts

In May 1994, US West filed its petition in the depreciation case seeking adjustments of its depreciation rates and accounting methodology. At US West's instigation and repeated urging, the case was heard on a paper record, with written testimony and rebuttal. Testimony was filed in the depreciation case in the fall of 1994, and briefing was submitted in January 1995. In February 1995, US West filed this rate case. In May 1995, the Commission filed its decision in the depreciation case. US West appealed the depreciation decision to the Superior Court. In October 1995, Commission Staff moved in the rate case for dismissal of those portions of US West's case that were directed at depreciation issues recently decided by the Commission in the depreciation case.

In January 1996, after motion, responses and argument, the Commission issued its Eleventh Supplemental Order in the rate case excluding the depreciation evidence from being heard again in the rate case. In February, the Superior Court remanded the depreciation order back to the Commission for additional findings. US West asked the Commission to amend the Eleventh Supplemental Order and to allow US West to introduce the depreciation evidence. The Commission denied that motion.

On April 11, 1996, the Commission issued both the Order deciding the rate case and the final order in the depreciation case. The Order in the rate case provided that the decisions in the depreciation case be applied to the final rate determination.

US West appealed the rate case to the Superior Court,

---

[10]The Commission and other parties have moved to strike from consideration certain extrarecord evidence pertaining to this issue in this case and in the depreciation case (*US West Communications, Inc. v. Utilities & Transp. Comm'n*, 134 Wn.2d 48 (1997)), the companion case to this case. As explained in the companion case, the motions to strike are granted.

arguing that the Commission artificially separated the evidence in the depreciation case from the evidence in the rate case. The Superior Court held that it was not incumbent on the Commission to revisit the same issues in the rate case that had just been considered in the depreciation case.

## Discussion

US West now argues to this Court that the Commission arbitrarily excluded from the rate case the Company's depreciation evidence regarding "shorter lives" and the "use of Equal Life Group depreciation methodology." These were the same issues which were decided in the depreciation case. The Company argues that whether or not the Commission had reviewed the evidence in the depreciation case, it was required to consider the depreciation evidence again in the rate case under RCW 34.05.570(3)(f). It further argues it had new and updated evidence to present on the depreciation issues not available in the depreciation case, and it argues the Commission ignored the new competitive environment.

US West's reliance on RCW 34.05.570(3)(f) is misplaced. That statute does hold that a court may grant relief from an agency order if the "agency has not decided all issues requiring resolution by the agency." However, under Title 80, the depreciation issues did not require resolution in the rate case. RCW 80.04.200 provides in relevant part:

> Any public service company affected by any order of the commission, and deeming itself aggrieved, may, *after the expiration of two years from the date of such order* taking effect, petition the commission for a rehearing upon the matters involved in such order, setting forth . . . the grounds and reasons for such rehearing, *which . . . may . . . consist of changed conditions since the issuance of such order* . . . . The commission, may, in its discretion, permit the filing of a petition for rehearing at any time.

(Emphasis added.)

The same issues which were considered in the depreciation case are the issues the Company sought to introduce in the rate case. Therefore, under RCW 80.04.200, the Commission did not have to rehear those issues in the rate case only months after they had been considered in the depreciation case. Under this statute, whether or not US West had "new" evidence or wished to argue that conditions had changed with regard to competition, the Commission was not obligated to hear the issues again within the two-year period.

It was within the Commission's discretion under RCW 80.04.200 to rehear the depreciation issues in the rate case. Discretionary decisions of the Commission are set aside only on a clear showing of abuse, which has not been made in this case. *E.g., ARCO*, 125 Wn.2d at 812.

US West also argues that the Commission was required to allow US West to recover its operating expenses, including its depreciation expenses. US West's implication that such recovery did not occur in the rate case is inaccurate. The Commission applied the depreciation rates found to be appropriate in the depreciation case in the final Order in the rate case.

US West also argues that the Commission ignored the competitive environment when deciding the rate case, and that the Commission should have reconsidered the depreciation evidence. The Commission made a specific finding in this case that the Company did not demonstrate that it faces effective competition sufficient to constrain prices in any market for its regulated services. The record reflects that US West still maintains a de facto monopoly presence in providing basic dial tone telecommunications services in Washington, and that effective competition does not yet exist for the major services offered by US West. In the depreciation case, the Commission found that the speed at which competition will develop, how effective it will turn out to be, and the effect of competition on technological obsolescence, are unknown. *US West Communications, Inc. v. Utilities & Transp. Comm'n*, 134 Wn.2d 48, 68, 949 P.2d

1321 (1997). The Order and the record support the Commission's contention that it did consider the effect of competition on rates before it made its decision. The telecommunications industry is changing significantly due to both competition and technology. The Commission Order in this case notes that one of the central factors considered in this rate proceeding was the effect of competition. The Commission's Order states:

> It is also uncontested that the future holds many unknowns. Cable television providers may package two-way telecommunications with one-way programming services. Wireless services may supplant rather than supplement wire-based communications in the future. Internet-based services may provide a viable alternative to measured toll service. The future presents a multitude of options, any or many of which may ultimately take a significant share of the Washington State telecommunications market.
>
> But [US West] has presented no credible evidence that the future is upon us to the extent that we may shift regulatory focus from costs to market-based pricing . . . . The Commission anticipates that at some point, it will indeed be necessary to shift regulatory focus from costs to market prices—but that point requires the existence of effective competition that can constrain prices.

AR at 1857-58. The Commission clearly did not ignore the competitive environment when it made its decision in this case.

US West also argues that the Commission unlawfully relied on the triennial represcription process[11] in addressing US West's depreciation requests. While the Commission did have to address the depreciation issues raised in the depreciation case and did so, it did not have to address those issues again a few months later in the rate case. Therefore, in the rate case, the Commission was free to note that the 1996 triennial represcription process would

---

[11]The "triennial represcription process" refers to the process which occurs every three years between the Commission, US West, and the Federal Communications Commission in which depreciation lives are renegotiated.

afford US West another opportunity in the near future to make a stronger case that lives should be shortened.

### Conclusion on Depreciation Evidence Issue

US West chose to file separately the depreciation case and the rate case. It was on the motion of US West that the depreciation case was tried on written expert testimony with rebuttal evidence. The Commission had more than 1,000 pages of expert testimony before it in the depreciation case. US West filed the rate case within weeks after final briefing was completed in the depreciation case. The depreciation decision was fully implemented in the rate case. We conclude it was US West's tactical decision to bring the two cases separately which caused the segregation of the issues. Under RCW 80.04.200, the Commission acted within its discretion in refusing to hear the depreciation issues again in the rate case.

### CENTREX SERVICE

**Issue:** Was the issue regarding the Centrex service properly before the Commission in this case?

### Facts

In 1993, US West filed with the Commission tariff and price list revisions affecting its Centrex service. In that case concerning Centrex Plus issues, the Commission staff argued that US West should not be allowed to "bundle" competitive services with monopoly features and to charge less for the monopoly features when they are purchased as part of a bundle with US West's competitive Centrex features. The Commission directed US West to begin true unbundling of its Centrex service, tariff the Centrex station line NAC as a bottleneck monopoly element, and reduce the bundling of elements to a minimum consistent with prudent engineering principles for minimum quality of service. The Company filed a tariff to implement the or-

der, which the Commission found to be in compliance with its Fourth Supplemental Order in the Centrex Plus case. However, in the Sixth Supplemental Order in the Centrex Plus case, the Commission also stated:

> The Commission expects that company filings in the future will move further toward the ultimate goals [unbundling] of the November 1993 Order than do the current filings. US West, Commission Staff, and other persons affected by the filings will participate in those proceedings offering new principles and policies, representing their positions and providing cost data or other bases for rate differentials which will allow the rates and prices for these services to move closer to "perfection."

CP at 916. All parties acknowledge that the Commission has the statutory authority to amend its orders. RCW 80.04.210.

In this rate case, US West made proposals regarding the Centrex package. Metronet argued that US West's proposals failed to meet the terms or goals of the Centrex Plus order that contemplate movement toward unbundling and nondiscriminatory treatment. It argued that pricing elements separately but requiring joint purchase is not unbundling, and that US West's actions violated Washington statutes, federal law and the Centrex Plus order. Enhanced Telemanagement, Inc. (ETI) also urged the Commission to reject US West's pricing proposals that would upset the existing Centrex Plus case formula. The Commission responded in its final Order in this case:

> The Commission finds that the existing arrangements are discriminatory and in practice they operate to benefit the Company. The Commission accepts Metronet's argument that it is high time for the Commission to order the Company to take the steps it encouraged the Company to take in the Centrex Plus compliance filing order. The order and its predecessor were clear in their terms and in their import. The Commission accepted a filing that fell short of perfection but enjoyed substantial agreement among most parties—excluding Metronet—and because it was a step in the direction

ordered by the Commission. Now in this filing the Company has proposed measures that would regress from the imperfect arrangements now in effect.

The Company shall file tariffs effecting the unbundling of the Centrex elements, pricing the highest Centrex Plus station line at the private line NAC rate, and remove the station location requirement. Doing so is consistent not only with both of the Centrex Plus orders cited above but also with the federal requirement requiring resale and unbundling.

AR at 1905.

## Discussion

US West now contends there was inadequate notice to allow the Commission to order it to unbundle its Centrex service in this rate case. It contends it did not have the opportunity to submit evidence or argument on this issue.

The Commission argues that this is a general rate case, that the notice to the Company included the fact that "alternate rate design or structure" (which would include the pricing of the Centrex components) was at issue, and that the prior recent order in the Centrex case had informed US West that future filings would move toward the goal of unbundling the Centrex. Additionally, the Commission argues there was testimony in the record regarding this issue, and that cross-examination and introduction of its own evidence were available to the Company. The record supports the Commission's statement that there was testimony in the record concerning the station location issue and the Centrex unbundling issue.

Metronet argues that if US West prevails on the Centrex issue, the delicate balance struck by the Commission will be upset, hindering emergence of competition and possibly eliminating existing competitors. Metronet argues that the broad notice of the hearings, the warning in the Centrex Plus order indicating the issue would be addressed in future filings, the presence of Metronet in the rate case, and the testimony in the record, all put US West on notice that the

Centrex issue was before the Commission. Metronet points out that US West never sought additional time to defend its Centrex Plus tariffs.

■■■■ In the Administrative Procedure Act notice of hearing section, an agency is required to give certain information to all parties, including the time and place of the hearing and "[a] short and plain statement of the matters asserted by the agency." RCW 34.05.434(2)(h). The next section provides that if the agency is unable to state the matters required by subsection (2)(h) at the time the notice is served, the initial notice may be limited to a statement of the issues involved. If the proceeding is initiated by a person other than the agency (as here), the initial notice may be limited to the inclusion of a copy of the initiating document. RCW 34.05.434(3). Since this was a general rate case and the first one for US West in 13 years, the issues were extremely broad and complex and the notice was stated very broadly. The notice of hearing stated:

> The ultimate issues involved are whether the tariff revisions are fair, just, reasonable, and sufficient, and in the public interest, as well as whether existing rates are just, reasonable, and sufficient and in the public interest. These issues include consideration of alternative rate design or structure.

AR at 19.

The pricing and unbundling of the Centrex features would be an aspect of "rate design or structure." Furthermore, the record supports the Commission's and Metronet's positions that US West was on notice that the Centrex issue was before the Commission in the rate proceeding. Metronet's attorney read the portion of the Sixth Supplemental Order from the Centrex docket quoted above into the record in this case. He stated that he intended to show the Company has done nothing pursuant to the directive in the Sixth Supplemental Order to move closer to eliminating the discriminatory aspects of the Cen-

trex Plus filing and to reduce the bundling of the Centrex Plus elements.

## Conclusion on Centrex Issue

We conclude the Company had notice that the issue was before the Commission from the original broad notice from the Commission, the statement in the Centrex Plus order, and the testimony during the rate case.

## COST STUDIES

**Issue:** Has US West abandoned the issue concerning the Commission's rejection of its cost studies?

## Facts

In its brief to this Court, US West assigns error to the Commission's rejection of its cost studies. US West states that the rejection of its "cost studies" was "not based on substantial evidence," was "arbitrary" and was "manifestly contrary to the evidence." US West then, in a footnote, states that although the Company fully briefed these issues to the Superior Court, it does not have adequate space to brief them in this appeal.

## Discussion

The Commission argues that US West has waived this issue on appeal. MCI, MCI Metro, and AT&T also argue US West has failed to preserve on appeal the issues involving cost studies, and that if US West had deemed the issue sufficiently important, there is no doubt it would have addressed the issue in its brief. The other parties seek incorporation of their trial briefing if this Court allows US West to incorporate its trial briefs.

We recently discussed a party's attempt to expand the issues subject to appeal by reference to trial memorandum. In *State v. Kalakosky,* 121 Wn.2d 525, 540

n.18, 852 P.2d 1064 (1993), we explained that allowing parties to expand the issues subject to appeal by reference to trial memorandum would render the Rules of Appellate Procedure meaningless. Only issues raised in the assignments of error, or related issues, and argued to the appellate court are considered on appeal. *Id.* (citing RAP 10.3; RAP 12.1; RAP 13.7). *See, e.g., State v. Hoffman*, 116 Wn.2d 51, 71, 804 P.2d 577 (1991); *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 46, 785 P.2d 815 (1990); *Painting & Decorating Contractors, Inc. v. Ellensburg Sch. Dist.*, 96 Wn.2d 806, 815-16, 638 P.2d 1220 (1982); *State v. Fortun*, 94 Wn.2d 754, 756, 626 P.2d 504 (1980); *State v. Cunningham*, 93 Wn.2d 823, 836, 613 P.2d 1139 (1980). *See also Patterson v. Superintendent of Pub. Instruction*, 76 Wn. App. 666, 676, 887 P.2d 411 (1994) (briefs presented to the trial court cannot be incorporated by reference into an appellate brief). RAP 10.3(a)(5) provides that the brief of the appellant should contain "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record."

## Conclusion on Cost Studies Issue

We will not allow US West to incorporate by reference parts of its trial brief, as it would allow the Company to violate the page limitations for briefing to the obvious prejudice to other parties. We hold that US West has abandoned this issue on appeal.

## SERVICE QUALITY

The Commission based its final Order, in part, on its finding that US West's service to its customers was inadequate. US West raises three issues regarding the Commission's Order: (1) whether the Commission could consider service quality when setting rates, (2) whether it has authority to require a customer service program, and (3)

whether it could consider the lack of benefit to ratepayers when disallowing certain bonuses to Company managers.

REDUCTION IN RATES

**Issue:** Does the Commission have authority to consider inadequate service in setting a public service company's authorized rate of return within the range of reasonableness?

Facts

During this case, the Commission held public hearings in seven cities in Washington at which customers reported the inability to obtain timely installation of service and delays in getting service restored following an outage. The Commission scheduled a special hearing to address customer service quality and sought information from Company executives responsible for service.

Commission staff testified that the number of informal service complaints reported to the Commission had increased dramatically in the years 1992-94 and appeared to be escalating to an all-time high in 1995. These complaints largely addressed inability to obtain service in a timely manner and undue delay in restoring service outages. The Commission considered at length the testimony of large customers, internet service providers, and telecommunications company customers, as well as individual telephone customers. In its Order, it concluded US West had failed to meet its minimum service obligations in dramatic and painful ways for all classes of its customers, and had failed increasingly year after year. The Commission found:

> [US West] is providing service that is substantially worse than that which the Company provided only a few years earlier, at the beginning of its AFOR. The Commission's frequent and consistent attempts to achieve improvement in service quality have been unsuccessful. We find major problems with the Company's ability to install service when needed and its ability to provide repair service when needed, caused in part by lack of facilities and in part by restructuring and downsizing.

The Company's inability to meet its basic service obligations hurts individual ratepayers and it hurts the state economy as a whole. This Commission has not micro-managed [US West's] re-engineering and restructuring efforts and does not intend to do so. We are concerned with results. To that end, we are ordering the Company to provide customer service guarantee programs and reducing the Company's return on equity by 0.5% to the low end of the reasonable range, to reflect the level of service it is providing and provide incentive for improvement. We also are ordering improved service quality statistics reporting, and disallowing management team and merit awards that are not clearly and directly linked to meeting service quality targets. When the Company can demonstrate that it is providing adequate service, it may petition to lift any or all of these requirements.

The Company has argued that it cannot invest in Washington state because of uncertainty about its future ability to recover its capital investment. The record in the case demonstrates this to be unfounded. Under the AFOR (January 16, 1990 to December 31, 1994), the Company was authorized to earn an attractive 11% rate of return, and it retained excess profits of $77 million. At the same time, it was cutting investment and reducing staffing levels in the state. Instead of re-investing its earnings in Washington State, the Company is generating funds by dis-investing in the state and failing to provide minimum levels of service to the harm of its citizens and economy. In this Order we authorize the Company to recover its proper costs of operating and to earn a market-based rate of return on its investment.

AR at 1789-90 (footnotes and citation omitted).

The Commission also found that

[a] rate of return in the range of 9.367% to 9.887% on [US West's] rate base will maintain its credit and financial integrity and will enable it to acquire sufficient new capital at reasonable terms to meet its service requirements. Setting the authorized return at 9.367% with the opportunity to increase the authorization to 9.627% upon satisfactory resolution of customer service quality problems will provide incentive to [US West] to improve its customer service quality. The ap-

propriate *overall rate of return for* [US West] *is therefore* 9.367%.[12]

AR at 1910.

The Commission also ordered the implementation of a customer service guarantee program similar to a program voluntarily proposed by US West. The Commission disallowed part of the incentive pay associated with the Company's team and merit awards programs.

The Commission explained that the Company's recordkeeping does not allow the Commission to determine how many orders have been delayed beyond the time allowed by the regulations. The Commission therefore also ordered the Company to improve recordkeeping and reporting to provide information sufficient to permit verification of compliance with the rules, and to afford the Commission the opportunity to pursue enforcement for violations of the rules.

The Commission's final Order states:

> [US West] is authorized rates in this proceeding based on the low point on the range of reasonable rate of return. The Company is authorized to petition in this Docket to have its rate of return restored to mid-range and to authorize the team and merit award adjustment upon [US West's] satisfactory demonstration that its service quality has significantly improved, as specified in the body of this Order.

AR at 1913.

## Discussion

US West argues that since the Commission decided not to impose penalties,[13] which it could have pursued under

---

[12]In the cost-of-equity portion of the Order, the Commission found that after the adjustment made for poor service quality, the proper equity rate of return for US West was 11.3%.

[13]US West argues there is no proof that it violated the "held order" rule, WAC 480-120-051(1) and (2). The Commission did not find the Company had violated this rule. Rather, it found that the Company's method of recordkeeping of held

RCW 80.04, the Commission has no authority to consider service quality when setting telephone rates. US West argues that the Commission has authority only to set rates that are fair, just, reasonable and sufficient, and that the Commission may consider only "purely financial factors" and not the quality of service which the Company is providing to its customers. US West concludes that the Legislature has not authorized the Commission to consider service quality as a factor in establishing rates. It essentially argues that the Commission must set rates without considering the fact that the Company has been providing poor service to its customers. We disagree. The statutes, our case law, and authority from other jurisdictions contradict this interpretation of rate-setting law.

 While US West cites to the portion of RCW 80.36.080 which requires that the rates for a telecommunications company must be "fair, just, reasonable and sufficient," it ignores the rest of that statute which states that "the service so to be rendered . . . by any telecommunications company shall be rendered and performed in a prompt, expeditious and efficient manner" and that "service shall be modern, adequate, sufficient and efficient." It is the law in Washington, and in other jurisdictions, that a regulatory commission may take the quality of service into account in fixing the appropriate rate of return for a utility. The Commission set US West's rate of return *within the range of reasonableness*, and it considered US West's poor service as one of many factors in determining the appropriate rate of return within that range. The Commission's conclusion that inadequate telephone service should cost less than adequate service is a reasonable one.

orders made it impossible for the Commission to verify customers' complaints to determine whether the rule had been violated. The Commission ordered US West to provide service reports which allow the Commission to determine how many orders have been held beyond the allowed time limits. The record shows that Commission staff had requested that the Company provide reports which would show how many orders were held beyond the allowed time limits, that under the Company's reporting methods the staff could not calculate the percentage of orders not completed, and that staff has been unable informally to persuade the Company to provide adequate information to determine compliance with Commission rules pertaining to held orders.

US West argues that a "penalty" was imposed on it for its poor service quality, and that the Commission "reduced [its] *authorized rate of return* by 0.5%." Br. of Appellant at 64 (emphasis added). This is not an accurate portrayal of the Order. The Commission established a range of reasonable returns. The Commission found that the rate of return in the range of 9.367% to 9.887% on the Company's rate base will maintain its credit and financial integrity, and will enable it to acquire sufficient new capital at reasonable terms to meet its service requirements. US West has made no showing that this range is unreasonable. We noted in *POWER* that a commission's rate decision would be affirmed if it fell within the " 'zone of reasonableness.' " *POWER*, 104 Wn.2d at 811 (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S. Ct. 1344, 20 L. Ed. 2d 312 (1968)); *see also Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251, 71 S. Ct. 692, 95 L. Ed. 912 (1951). The Company had no right to have rates set at the midpoint of the reasonable range. The question then is whether the Commission could consider service quality when deciding where, within the reasonable range, rates should be set.

US West argues that the Commission's *only* authority to respond to inadequate service is to impose penalties on the Company pursuant to RCW 80.04.380-.390. We disagree.[14] The Commission has much broader authority under Title 80. RCW 80.01.040 establishes the general powers and duties of the Commission. It provides in relevant part that the Commission shall

[r]egulate in the public interest, as provided by the public service laws, the rates, *services, facilities, and practices* of all persons engaging within this state in the business of supplying any utility service or commodity to the public for compensation, and related activities; including . . . telecommunications companies . . . .

---

[14]The Florida Supreme Court rejected a very similar argument in *Gulf Power Co. v. Wilson*, 597 So. 2d 270, 273 (Fla. 1992).

118

RCW 80.01.040(3) (emphasis added); *see also Electric Lightwave*, 123 Wn.2d at 534.

RCW 80.36.080 provides that all rates should be fair, just, reasonable and sufficient *and* the service rendered by any telecommunications company must be performed in a "prompt, expeditious and efficient manner." RCW 80.36.140 provides in part:

> *Whenever the commission shall find, after a hearing* had upon its own motion or upon complaint, *that the* rates, charges, tolls or rentals . . . charged . . . by any telecommunications company . . . or that the rules, regulations or *practices of any telecommunications company affecting* such rates, charges, tolls, rentals or *service are unjust, unreasonable,* unjustly discriminatory or unduly preferential, *or in anywise in violation of law . . . the commission shall determine the just and reasonable rates,* charges, tolls or rentals to be thereafter observed and in force, *and fix the same by order* as provided in this title.

(Emphasis added.)

All of the provisions of the public utilities statutes must be construed together to accomplish the purpose of assuring the public of adequate service at fair and reasonable rates. Statutes on the same subject matter must be read together to give each effect and to harmonize each with the other. *Bour v. Johnson*, 122 Wn.2d 829, 835, 864 P.2d 380 (1993). RCW 80.36.140, contained in the telecommunications statute, does not require that the Commission resort to the penalty statutes in RCW 80.04 in order to consider unreasonable or unjust service when setting rates. Nor is there anything in the penalty sections of RCW 80.04 which indicates they are the exclusive response the Commission may make to poor service by a public service company. Rather, the telecommunications statute specifically allows the Commission to consider service quality *when setting rates* for Washington's telephone customers. RCW 80.36.140 is in the telecommunications chapter of the public utilities statute. It specifically allows the Commission, after a hearing, to set rates based upon a finding that practices affect-

ing service are unreasonable. That is precisely what occurred in this case. The hearings conducted by the Commission were lengthy and detailed and allowed the Company to respond to the allegations of unreasonable service.[15] The Commission scheduled hearings to address customer service quality and allowed top Company executives responsible for service to respond. As discussed below, the testimony supports the Commission's findings that the quality of service provided by US West was unreasonable.[16]

The Company represents to this Court that it was never advised of the standards it was expected to meet nor given an opportunity to comply. The record does not support this. In late 1990, US West's Director of Regulatory Support responded to the consumer affairs manager of the Commission regarding "the serious nature of the current held order situation" and proposed a plan of action to deal with the problem, assuring the Commission that the held order situation in Washington was of serious concern to US West. However, complaints to the Commission about poor quality service continued to increase. In February 1995, the vice president of US West in this state wrote to the Commis-

_____

[15]US West was on notice that the quality of its service was an issue before the Commission. The Commission requested evidence on service quality in the Supplemental Notice to File Rebuttal Testimony, allowing the Company additional opportunity to submit evidence. Testimony was presented by US West. The Commission required US West to present a panel of witnesses to respond to service quality issues.

[16]We note that while the Commission did not find that all of the complaints lodged with the consumer affairs section of the Commission constituted rule violations, it did find that the increasing number of complaints lodged by consumers involved facts which would have given rise to rule violations, and that customers at the public hearings also reported repeated delays in installation of new service often without prior notice, and unreasonable delays in restoration of service outages. This testimony tracks the nature of the service complaints received by the Commission during the four years preceding this case. Furthermore, the Commission did not rely only on individual consumer complaints filed with the Commission or reported at the public hearings. It also heard extensive testimony about problems encountered by US West's large business and institutional customers. The witness testifying on behalf of TRACER, and discussing the service quality provided by US West to large business and institutional customers, testified that providing new digital facilities takes from three to six months, and in some cases as much as a year. This witness testified that our region's information economy will be at a competitive disadvantage if the serious service problems of US West are not corrected.

sion. That letter references a meeting between the Company and the Commission to discuss the "considerable growth in [US West] complaints filed with the Commission and, more importantly, [US West] violations of Commission rules relating to complaints." AR at 2909. The Company again agreed to implement corrective action. The Company's vice president stated he believed the Company could "eliminate over 75% of its rule violations within the next year . . . including the elimination of held order and out-of-service violations." AR at 2910. Subsequent to that time, the complaints about the Company's service increased. Testimony by the manager of the Commission's consumer affairs section indicates that Commission staff has been informally discussing and trying to obtain improvement in US West's service-related complaints in Washington since early 1990, and that the Company was aware of, and had acknowledged, the problems. The record supports the Commission's conclusions regarding its staff's efforts to work with the Company for the last few years to rectify increasing customer complaints. The Company was aware of the problems and was warned by the Commission to rectify the service problems. The Commission's final Order stated:

> The Commission Staff became aware of a significant and disturbing trend in service quality degradation for the Company beginning in 1991. The number of informal service complaints reported to the Commission increased dramatically in the years 1992-1994, and appear to be escalating to an all-time high in 1995. These complaints largely address inability to obtain service in a timely manner, and undue delay in restoring service outages.

> The Commission Staff during this timeframe, principally through the Commission's Consumer Affairs Section, diligently pursued not only resolution of individual complaints but also sought to gain the attention and support through ever-escalating levels of [US West's] senior management in an attempt to reverse the trend. The Company constantly reassured Commission Staff, in meetings and in written communications, not only of its commitment to service quality, but of its intention to resolve permanently its service quality

problems . . . . The Company has been delinquent on both counts.

AR at 1793-94.

The Legislature created the Commission to secure safe, adequate, and sufficient utility services for the public at just, fair, reasonable and sufficient rates. We must allow the Commission to perform its duties. As we have explained, the Commission "must in *each rate case* endeavor to not only assure fair prices *and service* to customers, but also to assure that regulated utilities earn enough to remain in business — each of which functions is as important in the eyes of the law as the other." *POWER*, 104 Wn.2d at 808 (emphasis added). In setting rates, the Commission is obligated to balance investor and consumer interests. *POWER*, 104 Wn.2d at 819 (citing *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S. Ct. 281, 88 L. Ed. 333 (1944). In *Jewell*, we explained that in a rate case the public is entitled to prompt, expeditious, and efficient service. Quid pro quo, the company is entitled to rates which are fair, just, reasonable and sufficient to allow it to render such services. *Jewell*, 90 Wn.2d at 777. The Commission's Order does seek to balance investor and consumer interests by allowing the Company a rate of return which allows it to maintain its credit and financial integrity, while also assuring that the Company will be financially motivated to correct its deficient service to its customers. The Commission's Order allows US West to have its rates raised as soon as it demonstrates it is providing adequate service to Washington customers.

A number of cases in other jurisdictions also recognize that a utility commission may consider the quality of service or the inefficiency of management in setting a fair and reasonable rate of return. A final rate may be set at the low end of a reasonable range because of poor service so long as it remains within a range that is determined to be reasonable. In *State ex rel. Utils. Comm'n v. General Tel. Co.*, 285 N.C. 671, 208 S.E.2d 681, 687 (1974), under a statute, like ours, which required just and reasonable rates and

adequate, efficient and reasonable service, the court held it was not the intent of the legislature to require the commission to fix rates without any regard to the quality of the service rendered by the telephone company. The court concluded that the quality of the service rendered is, necessarily, a factor to be considered in fixing the "just and reasonable" rate therefor. We agree. *See also In re Young's Community TV Corp.*, 141 Vt. 53, 442 A.2d 1311, 1313 (1982) (the commission properly considered poor service to customers in setting rates); *D.C.Transit Sys., Inc. v. Washington Area Metro. Transit Comm'n*, 466 F.2d 394, 419 (D.C. Cir. 1972) (the caliber of a utility's service may be a factor in determining a reasonable rate of return and inferior service deserves less return); *Gulf Power Co. v. Wilson*, 597 So. 2d 270, 273-74 (Fla. 1992) (a reduction in rates within the range of reasonable rates may be based on mismanagement by the utility); *In re General Tel. Co. v. Corporation Comm'n*, 98 N.M. 749, 652 P.2d 1200, 1209 (1982) (a commission is not precluded from properly considering, in a rate proceeding, quality or inadequacy of service in determining, under the facts in each case, what is a fair and reasonable rate of return to the utility); *Mountain Fuel Supply Co. v. Public Serv. Comm'n*, 861 P.2d 414, 427-28 (Utah 1993) (when determining a utility's "just and reasonable rate of return," the Commission has the authority to consider the utility's affiliate relationships and how they affect the quality of service).

In this case, the Commission set US West's rate within the rate of return range found to be reasonable. Hence, the consideration of poor service was neither an illegal penalty nor confiscatory. *See Gulf Power*, 597 So. 2d at 273.

We find the record supports the Commission's conclusions regarding the inadequate service provided by the Company. There is certainly sufficient evidence to support the conclusion that the Company's service was unreasonable. Testimony of TRACER's witness shows very long delays in new installations and in repair services which cost business, internet access provider, school, and hospital

customers large amounts of money and inconvenience. Testimony supports TRACER's conclusion that US West's service failures are causing many of its business and institutional customers to lose revenue, miss market opportunities, expend staff time, and waste operational dollars.

AT&T is one of US West's customers, as well as its competitor. The record supports its contention that it has experienced a dramatic decline in the quality of service it receives from US West. AT&T's witness testified that its business customers were affected by the delays of US West and that AT&T is unable to provide promised services to its customers.

Testimony from Electric Lightwave, Inc. (ELI), a competitor and customer of US West, describes severe installation delays and other service problems. ELI submitted a report to the Commission showing that out of 63 orders, US West was overdue on 51 and 1 had been cancelled. The ELI witness testified that the serious problems ELI has experienced in procuring US West's tariffed services has adversely affected ELI's ability to provide services to its own customers and its competitive position in the Washington market.

The manager of the consumer affairs section of the Commission testified that, while US West's growth was less than the other local exchange companies, after 1991 its service complaints per 100,000 access lines were far in excess of complaints against the other companies. Additionally, other than 1991, US West's service-related complaints since 1990 have shown a steady increase that does not correlate with access line growth. The Commission's conclusion that US West had just over 200 service-related complaints in 1991 and over 700 in 1994 is supported by testimony in the record. Testimony at the public hearings also supports the Commission's conclusions regarding inadequate service.

Conclusion on Consideration of Service Quality

We conclude there was substantial evidence to support

the Commission's finding that US West was providing inadequate service to its customers and its competitors, and that the Commission has authority to consider service quality in setting the rate of return within the range of reasonable rates.

CUSTOMER SERVICE PROGRAM

**Issue:** Did the Commission have the authority to require US West to implement a customer service program to improve its service deficiency?

Facts

The Commission ordered US West to provide a customer service program similar to a service guarantee program which the Company had offered to provide. Briefly, the program provides that US West waive certain customer fees and provide free cellular service when the Company fails to complete installations within a set time.

Discussion

US West now argues that despite its voluntary willingness to offer a similar customer service guarantee program, the Commission was without statutory authority to order US West to provide it. We find the Commission did have authority to make such an order. RCW 80.36.140 provides in relevant part:

> Whenever the commission shall find . . . after . . . hearing . . . that the . . . service of any telecommunications company is inadequate, inefficient, improper or insufficient, the commission shall determine the just, reasonable, proper, adequate and efficient . . . practices, equipment, facilities and service to

be thereafter installed, observed and used, and fix the same by order . . . .

### Conclusion on Customer Service Program

The customer service program is a remedy within the authority provided by RCW 80.36.140.

### TEAM AND MERIT AWARDS

**Issue:** Did the Commission properly consider the lack of ratepayer benefit when it disallowed the team and merit awards?

### Facts

The Commission excluded from US West's revenue requirement certain expenses for which the Company sought recovery, including "team" and "merit" awards to its employees. The Commission explained they were excluded, in part, because they were not based on criteria that provided any benefit to the ratepayers and were in effect at cross-purposes with service quality. The Order states:

> In the [US West] plan, only a portion of the incentives were directly tied to service or service-related elements. The service goals were not met and that portion was not distributed. The income-related portion, however, was met and exceeded. What is particularly objectionable about this plan is not only that the financial incentives were independent of the service incentives, but the program was constructed so that, if the Company exceeded the stated financial goals by only 8%, employees could "replace" all of the bonus that they would "lose" for failure to achieve customer service goals . . . .

> . . . [T]here is a potential tension between service quality and earnings. A firm can concentrate on financial elements so heavily that it can lose sight of the importance of providing customer service. In a public utility service, where many customers have no reasonably substitutable alternatives, the

Commission must substitute for the competitive market in assuring that customer service remains a priority to the business . . . .

The Commission finds that the Company's team award plan is not acceptable because, with a structure allowing financial rewards to eclipse customer service failures, it sends the message to employees that service quality is much less important than financial performance. This provides motivation to choose cost saving measures that unduly compromise service quality. The Company plan fails to tie payments to goals that clearly and directly benefit ratepayers. The Company's service quality clearly failed to meet acceptable standards during the test period, as discussed above, while the Company exceeded its financial goals. Whether or not the structure of team awards contributed to this circumstance, it is certainly consistent with the circumstance.

AR at 1826-27.

## Discussion

US West argues that taking ratepayer "benefit" into account in deciding what expenses can be passed on to ratepayers is legally incorrect and that any expenses that are "utility-related" and "prudent" *must* be included in the revenue requirement that can be recovered from the ratepayers. This position is not supported by Washington law. An expense may be prudent but not recoverable from ratepayers if it provides no benefit. In the *Jewell* case, we held that the Commission erred in allowing charitable contributions made by PNB to be included as part of the expenses of doing business in establishing telephone rates. We concluded there was no benefit to the ratepayers and that the shareholders of the Company, and not the ratepayers, should therefore absorb such expenses. *Jewell*, 90 Wn.2d at 778-79. In *POWER*, we affirmed the Commission's decision to allow the utility to recover the expenses of designing a nuclear plant that was later canceled. We based our rationale on the fact that the ratepayers would benefit from the company's ability to obtain financing at

lower rates in the future. Ratepayer benefit was critical to our decision to allow recovery of the expenses. *POWER,* 104 Wn.2d at 818. *See also* RICHARD J. PIERCE, JR. & ERNEST GELLHORN, REGULATED INDUSTRIES IN A NUTSHELL 140 (3d ed. 1994) (an expense can be disallowed if it does not benefit customers who purchase regulated products).

### Conclusion on Team and Merit Awards

▮▮▮ We hold the Commission acted within its discretion in disallowing bonus payments which did not benefit the ratepayers and which tended to lower service quality.

### CONCLUSION

US West has not carried its burden to demonstrate the invalidity of the Commission's Order. We find the Commission has acted within its statutory authority and has properly interpreted the law. The findings in its Order are supported by substantial evidence in the record before us and the Commission has decided all issues requiring resolution. US West has not shown any decision to be arbitrary or capricious or unconstitutional. We conclude the Superior Court correctly affirmed the Commission's decision.

Affirmed.

DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON, MADSEN, and TALMADGE, JJ., concur.

ALEXANDER, J. (concurring in part, dissenting in part) — I agree with the majority opinion in all respects save one. In my view, the majority incorrectly concludes that the Washington Utilities and Transportation Commission (Commission) had authority to reduce US West's return on equity by approximately 0.5 percent as a reaction to what it concluded was US West's poor level of past service and as an incentive for US West to improve its service. I am satisfied that the reduction was a penalty which the Commission is without authority to impose under the guise of rate making. I, therefore, dissent in part to the majority opinion.

The majority indicates that "[i]t is the law in Washington, and in other jurisdictions, that a regulatory commission may take the quality of service into account in fixing the appropriate rate of return for a utility." Majority op. at 116. Even assuming that is a correct statement, it is not justification for the imposition of penalties in rate making. Indeed, any assertion that it is is belied by a plain reading of the statute upon which the majority relies, that statute indicating only that rates for a telecommunication company must be "fair, just, reasonable and sufficient." RCW 80.36.080. Although the statute provides, additionally, that the service rendered by such companies is to be performed in a "prompt, expeditious and efficient manner" and that service is to be "modern, adequate, sufficient and efficient," it does not logically follow that the process for setting future utility rates may be transformed into a proceeding to exact penalties from a regulated utility for deficiencies in its past service.

It is apparent from the record that if the Commission had not concluded that US West's past service was insufficient it would have established its return on equity at 11.8 percent. By reducing US West's future return on equity by 0.5 percent to 11.3 percent the Commission was, in essence, penalizing US West for what it perceived was its poor past service. Significantly, in its order the Commission did not attempt to conceal its intention to do just that, stating: "[W]e are ordering the Company to provide customer service guarantee programs and reducing the Company's return on equity by 0.5 percent to the low end of the reasonable range, to reflect the level of service it is providing and provide incentive for improvement." Administrative Record at 1789.

The majority suggests that the Commission's decision to reduce US West's return on equity was reasonable because the reduced overall rate of return was within what the Commission found was the range of reasonableness of 9.367 to 9.887 percent. This makes little sense and does not obscure the fact that the Commission reduced US West's

return on equity below the level it would have otherwise been fixed, simply because of what it perceived was US West's poor service in the past and as an incentive to improve its service. Clearly that decision had no relationship to the financial factors that should bear on the reasonableness of a future rate. While I do not quarrel with the majority's assertion, based on our decision in *People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n*, 104 Wn.2d 798, 711 P.2d 319 (1985), that a rate decision will be affirmed if it is within the "zone of reasonableness," that does not, in my view, warrant the Commission's reduction of the return to a level lower than that which it determined was fair and reasonable simply to penalize the utility.

In reaching this conclusion, I find myself in agreement with the view taken by the Supreme Court of New Mexico in *In re General Tel. Co.*, 98 N.M. 749, 652 P.2d 1200 (1982). Although I recognize that it is not always helpful to rely on cases from another jurisdiction where the pertinent statutes may differ from those confronting this court, the facts of that case are strikingly similar to those of the instant case and the logic of the New Mexico decision is unassailable. In *General Telephone*, the New Mexico Corporation Commission determined in a rate-setting case that General Telephone had not been providing satisfactory service and, consequently, it granted an 11.5 percent rate of return rather than a return of 11.91 percent, the rate it would have granted General Telephone in the absence of its finding of service inadequacies. In striking the Commission's action down, the New Mexico Court said:

> *We agree with the rationale stated in the foregoing cases, that a regulatory commission has no authority to deny an increase in rates in an amount which it has first found to be just, fair and reasonable, by means of imposing a subsequent penalty for poor or inadequate service.* However, this does not preclude the SCC from properly considering in a rate proceeding, quality or inadequacy of service in determining, under the facts and circumstances in each particular case, what is a fair, just and reasonable rate of return to the utility. *We conclude in this case that once the SCC had arrived at a fair and reason-*

*able rate of return, it had no authority to penalize a utility for reasons relating to the quality of service in a ratemaking proceeding.*

*General Tel.*, 652 P.2d at 1209 (emphasis added). Although the majority would undoubtedly stress the portion of the above quote that indicates a regulatory commission may consider quality or inadequacy of service in setting utility rates, when it is read in context it does not justify the imposition of a penalty for poor service.

My conclusion is buttressed by the knowledge that courts in other jurisdictions have reached a conclusion similar to that of the New Mexico court. *See Askew v. Bevis*, 283 So. 2d 337, 2 Pub. Util. Rep. 4th 404 (Fla. 1973); *Florida Tel. Corp. v. Carter*, 70 So. 2d 508, 3 Pub. Util. Rep. 3d 145 (Fla. 1954); *South Cent. Bell Tel. Co. v. Utility Regulatory Comm'n*, 637 S.W.2d 649 (Ky. 1982); *Southern Bell Tel. & Tel. Co. v. Louisiana Pub. Serv. Comm'n*, 28 Pub. Util. Rep. 3d 303 (19th Jud. Dist. 1959); *General Tel. Co. v. Michigan Pub. Serv. Comm'n*, 341 Mich. 620, 67 N.W.2d 882 (1954); *Southern Tel. Co. v. United Tel. Co.*, 5 Pub. Util. Rep. 3d 75 (Pa. P.U.C. 1954).

Although I disapprove of the Commission's action here, I note that Washington's Commission is not powerless to deal with what it finds is inadequate service on the part of telecommunications companies. The Legislature has provided specific statutory authority to the Commission to assess penalties against public utilities for violations of chapter 80 RCW and for a utility's failure to comply with a rule, direction, demand, order or requirement of the Commission. RCW 80.04.380. Although the Commission had not previously entered an order fixing the quality of service it expected of US West, it had the authority to do that pursuant to RCW 80.36.140. If it had, it could have imposed penalties upon US West, after notice and hearing, for US West's failure, if any, to comply with its prior orders.

Finally, it is apparent to me that from a purely pragmatic standpoint it is far more sensible to deal with allegations of

poor service in a statutorily authorized penalty proceeding that is devoted strictly to that issue than in a rate-setting hearing. A rate-setting hearing should be devoted to the rate-setting function. To allow it to be transformed into a penalty proceeding at which the principals present anecdotal evidence relating to service quality can only create confusion and detract from the rate setting function. At best the setting of future rates for telecommunications companies is complicated. To allow the Commission to impose penalties for what it perceives are past failures of the Utility under the guise of setting future rates is distracting and it subverts the rate-setting process by allowing it to be affected by subjective considerations that do not directly bear directly on the cost of providing future service.

In sum, I am satisfied that the Commission erred in imposing a penalty on US West under the guise of rate-making and to the extent the majority's decision reflects that error, I would reverse.

SANDERS, J., concurs with ALEXANDER, J.